UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ATHEISTS OF FLORIDA, INC. and
ELLENBETH WACHS,

      Plaintiffs,

v.

                                Case No. 8:10-cv-1538-T-17-MAP

CITY OF LAKELAND, Florida and
MAYOR GOW FIELDS in his official
capacity as Chairman of the Lakeland
City Commission and in his individual
capacity,

      Defendants.

_____/

## ORDER ON DEFENDANTS' MOTION TO DISMISS

      This cause is before the Court on Defendants', City of Lakeland and Mayor Gow Fields,

Motion to Dismiss (Doc. 15) and Plaintiffs', Atheists of Florida, Inc. and Ellenbeth Wachs,

response thereto (Doc. 21). For the reasons set forth below, Defendants' Motion to Dismiss is

**DENIED IN PART**, as to Counts I and II, and **GRANTED IN PART**, as to Counts III and IV.

The following facts, gleaned from Plaintiffs' First Amended Complaint (Doc. 10) and the

exhibits appended thereto, are taken as true for purposes of this motion.

## BACKGROUND AND PROCEDURAL HISTORY

      Plaintiffs, Atheists of Florida, Inc. and Ellenbeth Wachs (hereinafter "Plaintiffs"), filed

this action on July 12, 2010, to challenge Defendants', City of Lakeland and Mayor Gow Fields

(hereinafter collectively referred to as "City" or "Defendants"), practice of soliciting and

allowing religious ministers to perform prayer rituals, or invocations, before each meeting of the Lakeland City Commission. Plaintiff Atheists of Florida is a nonprofit corporation that "seeks freedom of and from religion [and] equal treatment under the law . . . ." (Doc. 10, ¶15). Plaintiff Ellenbeth Wachs is the Director of the Lakeland Chapter of Atheists of Florida. Plaintiffs' four-count complaint (Doc. 10) alleges violations of 42 U.S.C. § 1983 with regard to the Establishment Clause (Count I), the Equal Protection Clause (Count III), and the Freedom of Speech Clause (Count IV) of the United States Constitution, and also sets out a claim under the Establishment Clause of the Florida Constitution (Count II). Plaintiffs seek declaratory relief pronouncing the Lakeland City Commission's prayer policy illegal, injunctive relief preventing Defendants from continuing the practice, nominal money damages, and attorney's fees pursuant to 42 U.S.C. § 1988.

This case stems from the Lakeland City Commission's practice of beginning each of its bi-monthly meetings with a prayer invocation. Plaintiffs have attended these meetings in the past, viewed them over the Internet, and plan to attend them in the future; they thus claim to have been subjected to unwelcome endorsement of religion "with government imprimatur." (Doc. 10, ¶ 21).

The City maintains a list of religious representatives from which it chooses various clergy to deliver prayers at the beginning of each City Commission meeting. Plaintiffs assert that the City expends considerable financial and administrative resources compiling the list and in mailing invitations to the religious representatives requesting that they present prayers. Prior to August 2, 2010, the City compiled the list of potential prayer-givers by referencing the "Yellow Pages." Plaintiffs contend that the City's selection process evidences a custom and practice of categorically excluding non-Christian religious groups and the non-religious. They note that the

2

City's 2010 Invocation Schedule originally included only Protestant Christian figures, with the exception of one Catholic priest.

Beginning in March 2010, Plaintiffs began to complain to the City about the prayers at its City Commission meetings. On March 15, 2010, Plaintiffs delivered a letter to Defendant Fields, Mayor of Lakeland, asking that the City dispense with its religious prayer practice and instead offer a "silent moment of reflection" to solemnize the Commission meetings. (Doc. 10, Ex. 2). While Defendant Fields responded in a March 18 letter that "[t]he practice of opening Lakeland City Commission meetings with an invocation has a long history and will continue unless the City Commission decides it should be changed," he also defended the practice, explaining that "[e]very effort is made to ensure that those offering an inspirational message [are] representative of Lakeland's diverse religious community." (Doc. 10, Ex. 3).

Following Plaintiffs' initial letter of complaint, the City continued its practice of inviting Christian invocation speakers to offer prayers at the start of City Commission meetings. On May 3, 2010, however, the City invited a Jewish Cantor to give the prayer. According to Plaintiffs, that was the only instance of a non-Christian prayer during the time periods relevant to this suit. In the months to follow, Plaintiffs continued to agitate against the prayer policy and, unsatisfied by the City's response, initiated the instant action on July 12, 2010.

Just a few weeks after the filing of the initial Complaint, on August 2, 2010, the Lakeland City Commission proposed Resolution No. 10-041 (the "Resolution") for the purpose of "codifying its policy regarding invocations before meetings of the Lakeland City Commission." (Doc. 10, Ex. 4). The Lakeland City Attorney explained on August 2nd that the Resolution was part of the city's "litigation strategy." (Doc. 10). The Resolution, which passed by a vote of 6-0 that very same day, begins by explaining that the Commission "wishes to maintain a tradition of

3

solemnizing its proceedings by allowing for an opening invocation before each meeting, for the benefit and blessing of the Commission." (Doc. 10, Ex. 4). The Resolution then sets forth the relevant Supreme Court and Eleventh Circuit legal precedent regarding legislative prayer and declares that "the Commission intends, and has intended in past practice, to adopt a policy that does not proselytize or advance any faith, or show any purposeful preference of one religious view to the exclusion of others." (Doc. 10, Ex. 4)

Finally, Resolution 10-041 provides that an invitation to deliver the invocation at a City Commission meeting must be mailed to each entry on the City's official "Congregations List." The Congregations List is to "be compiled by referencing the listing for 'churches,' 'congregations,' or other religious assemblies in the annual Yellow Pages phone book(s) published for the [sic] Lakeland and Polk County[,] researched from the Internet, and consultation with local chambers of commerce." Further, "[a]ll religious congregations with an established presence in the local community . . . shall be[] included in the Congregations List. Any such congregation not otherwise identified for participation may request its inclusion by specific written communication to the Secretary." The Resolution also removes the invocation from the official meeting agenda and provides for a disclaimer to be placed on the meeting agenda clarifying that "the Commission is not allowed by law to endorse the religious beliefs or views of this, or any other speaker." (Doc. 10, Ex. 4).

Following the passage of Resolution 10-041, Plaintiffs amended their complaint to include contentions that the Resolution itself codifies an unconstitutional practice and that, in the alternative, the City has failed to follow the Resolution's enumerated policy for selecting prayer-givers and for ensuring that the invocation is given before the start of the Commission meeting's

4

official business.  Approximately one month after passing the Resolution, on September 8, 2010, the City filed the instant Motion to Dismiss (Doc. 15).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure Rule 8(a)(2) requires that a plaintiff's complaint lay out "a short and plain statement of the claim showing that the pleader is entitled to relief" in order to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Conley v. Gibson,* 355 U.S. 41, 47 (1957).  That said, "[w]hile a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do."  *Bell Atl. Corp. v. Twombly,* 550 U.S 544, 555 (2007) (internal quotation marks and citation omitted).

Therefore, "to survive a motion to dismiss, a complaint must now contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Am. Dental Ass'n v. Cigna Corp.,* 605 F.3d 1283, 1289 (11th Cir. 2010) (quoting *Twombly,* 550 U.S. at 570).  In considering a motion to dismiss, courts must follow a simple, two-pronged approach: "1) eliminate any allegations in the complaint that are merely legal conclusions; and 2) where there are well-pleaded factual allegations, 'assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Id.* at 1290 (quoting *Ashcroft v. Iqbal,* 129 S. Ct. 1937, 1950 (2009)).  In sum, the "pleading standard Rule 8 announces does not require 'detailed factual allegations,' but demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Iqbal,* 129 S. Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555).

## DISCUSSION

At the threshold, and before considering the merits of the City's substantive attacks under Rule 12(b)(6), the Court must consider Defendants' contention that the passage of Resolution 10-041 renders this cause moot. *North Carolina v. Rice*, 404 U.S. 244, 245-246 (1971) (explaining that mootness is a threshold question); *see Sheely v. MRI Radiology Network, P.A.*, 505 F.3d 1173, 1182 (11th Cir. 2007) (noting that a dismissal on mootness grounds is procedurally a dismissal for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)). Only if Plaintiffs' claim survives the mootness challenge will this Court continue on to determine if the allegations as set forth in the complaint "plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950.

### A.  Mootness

Article III, Section 2 of the United States Constitution extends federal jurisdiction only to live "cases" and "controversies." *Troiano v. Supervisor of Elections in Palm Beach Cnty.*, 382 F.3d 1276, 1281 (11th Cir. 2004). "Put another way, 'a case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief.'" *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir. 2001) (quoting *Fla. Ass'n Rehab. Facilities, Inc. v. Fla. Dep't Health & Rehab. Servs.*, 225 F.3d 1208, 1216-1217 (11th Cir. 2000)). Deciding a moot issue is the equivalent of issuing an advisory opinion and, therefore, is not within the jurisdiction of Article III courts. *Friends of the Everglades v. S. Fla. Water Mgmt. Dist.*, 570 F.3d 1210, 1216 (11th Cir. 2009) ("To decide questions that do not matter to the disposition of a case is to separate Lady Justice's scales from her sword. That we will not do." (citation omitted)). Thus, the court is *required* to dismiss a moot action for want of jurisdiction. *Seay Outdoor Adver., Inc.*

*v. City of Mary Esther*, 397 F.3d 943, 946 (11th Cir. 2005); *see Nat'l Adver. Co. v. City of Miami* (*Nat'l Adver. I*), 402 F.3d 1329, 1332 (11th Cir. 2005) (per curiam).

"When a subsequent law brings the controversy to an end, 'the case becomes moot and should be treated accordingly.'" *Coal. for the Abolition of Marijuana Prohibition v. City of Atlanta*, 219 F.3d 1301, 1310 (11th Cir. 2000) (quoting *Church of Scientology Flag Serv. Org., Inc. v. City of Clearwater*, 777 F.2d 598, 605 (11th Cir. 1985)). Indeed, "[c]onstitutional challenges to statutes are routinely found moot when a statute is amended or repealed." *Seay*, 397 F.3d at 947; *see Coral Springs Street Sys., Inc. v. City of Sunrise*, 371 F.3d 1320, 1328 (11th Cir. 2004) (explaining that a change in the law or a change in circumstances will often moot a controversy). Nonetheless, "it is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quoting *City of Mesquite v. Aladdin's Castle*, 455 U.S. 283, 289 (1982)). The repeal or replacement of a challenged law will moot a case only: (a) "'if subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur,'" *Coral Springs*, 371 F.3d at 1328 (quoting *Sec'y of Labor v. Burger King Corp.*, 995 F.2d 681, 684 (11th Cir. 1992)); and (b) "where 'a superseding statute satisfies *all* the principles sought in an attack on the prior statute." *Naturist Soc'y, Inc. v. Fillyaw*, 958 F.2d 1515, 1520 (11th Cir. 1992) (emphasis in original) (quoting *Johnson v. State*, 586 F.2d 387, 288 (5th Cir. 1978)).

As to the reasonable expectation that the wrongful behavior will recur, after a change in circumstance or a repeal of a challenged law, a case is moot unless "there is a substantial likelihood" that the challenged practice or statute will be reinstated. *Nat'l Adver. I*, 402 F.3d at

7

1334; *Coral Springs*, 371 F.3d at 1329. What is more, "when the defendant is not a private citizen but a government actor, there is a rebuttable presumption that the objectionable behavior will *not* recur." *Troiano*, 382 F.3d at 1283 (emphasis in original); *see Coral Springs*, 371 F.3d at 1328-1329 (noting that "governmental entities and officials have been given considerably more leeway than private parties in the presumption that they are unlikely to resume illegal activities"). However, in assessing the likelihood that a government actor will reinstate a challenged practice, the timing of the change in the law can be essential to addressing the government's "sincerity," and thus the chances that the change in the law is merely a litigation tactic designed to remove the court's jurisdiction. *Coral Springs*, 371 F.3d at 1331; *see Nat'l Adver. I*, 402 F.3d at 1333 ("[V]oluntary cessation of offensive conduct will only moot litigation if it is clear that the defendant has not changed course simply to deprive the court of jurisdiction."); *U.S. v. W. T. Grant Co.*, 345 U.S. 629, 638 (1953) ("It is the duty of the courts to beware of efforts to defeat injunctive relief by protestations of repentance and reform, especially when abandonment seems timed to anticipate suit . . . ."); *see also Harrell v. Fla. Bar*, 608 F.3d 1241, 1266 (11th Cir. 2010) (noting that "the timing and content" of a decision to voluntarily cease challenged behavior are "critical" to determining whether there is any reasonable expectation of recurrence, and explaining that when cessation occurs "late in the game" the court will be "more skeptical" in its assessment of mootness); *Burger King*, 955 F.2d at 684 (finding case not moot where cessation came "on the eve of trial"); *Nat'l Adver. Co. v. City of Fort Lauderdale*, 934 F.2d 283, 286 (11th Cir. 1991) (finding case not moot where cessation came six weeks after filing of suit and City filed motion to dismiss the very next day); *Jager v. Douglas Cnty. Sch. Dist.*, 862 F.2d 824, 833-834 (11th Cir. 1989) (finding case not moot where cessation came "[u]nder the imminent threat of the [plaintiffs'] lawsuit"). Nonetheless, the "City's

8

purpose in amending the statute is not the central focus of our inquiry nor is it dispositive." *Nat'l Adver. I*, 402 F.3d at 1134. Rather, the "*most significant*[]" determining factor is "'whether the court is sufficiently convinced that the repealed law will not be brought back.'" *Id.* (quoting *Coral Springs*, 371 F.3d at 1331) (emphasis in original).

In addition to the likelihood that the challenged policy will be reinstated, the enactment of a superseding law will not render a case moot "when [the previous policy] is replaced by another constitutionally suspect law." *Seay*, 397 F.3d at 947. In other words, a "'superseding statute or regulation moots a case only to the extent that it removes challenged features of the prior law. To the extent that those features remain in place, and changes in the law have not so fundamentally altered the statutory framework as to render the original controversy a mere abstraction, the case is not moot.'" *Coal. for the Abolition of Marijuana Prohibition*, 219 F.3d at 1310 (quoting *Fillyaw*, 958 F.2d at 1520)).

Applying the principles laid out above to the case at bar, it is important to first note that this is not a case of a challenged statute or ordinance that is later repealed or superseded, as was the case in almost every authority on point. Rather, here the City previously had no law at all, but adhered to an unwritten policy or practice of inviting different religious figures to deliver the invocation at City Commission meetings. When Plaintiffs began agitating against that unwritten policy, the City issued Resolution 10-041 (an entirely new law) codifying its previously unwritten practice. (Doc. 10, Ex. 4).

If this were a case of the simple replacement of a challenged law with a new, superseding law, this Court would simply assess the constitutionality of the new law, evaluate whether the challenged behavior is likely to recur and, assuming the City slaked both conditions, declare the case moot. *See Seay*, 397 F.3d at 947. Therefore, assuming that the same legal paradigm for

repealed or superseded statutes applies here, and assuming *arguendo* that the City's written policy, Resolution 10-041, is constitutional, its enactment would possibly render this action moot. The City did pass Resolution 10-041 three weeks *after* Plaintiffs filed suit in this case, a factor that weighs against mootness; however, that fact is not dispositive. *Nat'l Adver. I*, 402 F.3d at 1134. Moreover, Plaintiffs contend that the Lakeland City Attorney admitted that the passage of Resolution 10-041 was part of the City's "litigation strategy" (Doc. 10, ¶100), a fact that tends to show that the City "changed course simply to deprive the court of jurisdiction" and thus augurs against a finding of mootness.[1] *Nat'l Adver. I*, 402 F.3d at 1333. On the other hand, because government actors enjoy "a rebuttable presumption that the objectionable behavior will *not* recur," *Troiano*, 382 F.3d at 1283, Plaintiffs would bear the heavy "burden of presenting *affirmative* evidence" that the City might reenact the challenged practice. *Nat'l Adver. I*, 402 F.3d at 1334 (emphasis in original).

There is more afoot here, however. Plaintiffs do not merely argue that Resolution 10-041 itself codifies an unconstitutional practice; instead, Plaintiffs also argue that the City's "actual policy, practice, or custom" is *different* from that codified in Resolution 10-041. (Doc. 10, ¶91). In any 42 U.S.C. § 1983 action, a municipal entity is liable *either* if its official policy is constitutionally repugnant *or* if "the repeated acts of the final policymaker of the entity" demonstrate "an unofficial custom or practice" that is unconstitutional. *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329-1330 (11th Cir. 2003). While liability cannot be based upon an isolated incident, *McDowell v. Brown*, 392 F.3d 1289, 1290 (11th Cir. 2004), and the policy or custom

---

[1] It is also important to note that in *Pelphrey v. Cobb County*, the seminal case concerning legislative prayer in this jurisdiction, the Cobb County Commission and the Cobb County Planning Commission discontinued the challenged policies long before the case made its way before the Eleventh Circuit Court of Appeals. 547 F.3d 1263, 1268 (11th Cir. 2008). Nonetheless, and despite the fact that "the question of mootness is jurisdictional in nature [and] may be raised by the court sua sponte, regardless of whether the district court considered it or if the parties briefed the issue," *Nat'l Adver. I*, 402 F.3d at 1332, the Eleventh Circuit evaluated the substantive merits of the case. *Pelphrey*, 547 F.3d at 1281.

must be the moving force of the constitutional violation, *Grech*, 335 F.3d at 1330; *see Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998), the fact remains that a "practice, although not authorized by written law or express municipal policy," can form the basis for § 1983 liability. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988).

Ultimately, because Plaintiffs contend not only that the City's official policy is unconstitutional, but also that the City is not actually following that policy, it can hardly be said that the enactment of Resolution 10-041 in this case is sufficient "to render the original controversy a mere abstraction." *Coal. for the Abolition of Marijuana Prohibition*, 219 F.3d at 1310 (quoting *Fillyaw*, 958 F.2d at 1520). Here, the Lakeland City Commission and Defendant Fields, as Mayor of the City, are undoubtedly the final policymakers for the City of Lakeland. Lakeland City Charter, § 8; Fla. Const. art. VIII, § 2. Given the charitable standard of review applied to factual allegations at this stage of the proceedings, Defendants' mootness challenge must accordingly fail. *See Rivell v. Priv. Health Care Sys., Inc.*, 520 F.3d 1308, 1309 (11th Cir. 2008) (explaining that, for purposes of a motion to dismiss, the "allegations in the complaint are taken as true and construed in the light most favorable to the plaintiffs") (quoting *Hoffman-Pugh v. Ramsey*, 312 F.3d 1222, 1225 (11th Cir.2002)).

That is not to say, of course, that the Plaintiffs will be able to amass sufficient evidence of Defendants' allegedly unconstitutional practices to defeat a motion for summary judgment. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (providing that the nonmoving party must "designate specific facts showing that there is a genuine issue for trial" to defeat summary judgment). Problems of proof abound in cases such as these. Those problems, however, are best left for another day. At this early juncture, it is enough to say that Plaintiffs have presented a

11

"live case or controversy" for resolution to this Court, and, therefore, the case is not moot. *CAMP Leg. Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1277 (11th Cir. 2006).

## B. Substantive Claims

Having dispensed with Defendants' justiciability challenge, the Court now turns to Defendants' Rule 12(b)(6) motion to dismiss for failure to state a claim upon which relief can be granted. Because Defendants move to dismiss all counts (Counts I-IV) of Plaintiffs' complaint, the Court will address each in turn.

### 1. Federal Establishment Clause

The gravamen of Plaintiffs' complaint alleges that Defendants' prayer policy violates the Establishment Clause of the United States Constitution, which provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. Const. Amend. I. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). As both parties acknowledge in their pleadings, the extant case is squarely controlled by the Supreme Court's seminal legislative prayer case, *Marsh v. Chambers*, 463 U.S. 783 (1983), and the Eleventh Circuit's recent embellishment thereof, *Pelphrey v. Cobb County*, 547 F.3d 1263 (11th Cir. 2008).

In *Marsh*, the Supreme Court considered a challenge to the Nebraska State Legislature's practice of beginning each of its sessions with a prayer offered by a chaplain paid from the public fisc. 463 U.S. at 784-785. The Court noted that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." *Id.* at 786. The Court refused to apply the traditional establishment clause test provided by *Lemon v. Kurtzman*, 403 U.S. 602, 612-613 (1971), noting that because the First

12

Congress had reached agreement on the language of the Bill of Rights only three days after authorizing the appointment of paid chaplains, the Framers "[c]learly . . . did not view paid legislative chaplains and opening prayers as a violation of [the First] Amendment." *Marsh*, 463 U.S. at 788.

The *Marsh* Court concluded that, because "the practice of opening legislative sessions with prayer has become part of the fabric of our society," *Id.* at 792, the fact that the Nebraska Legislature had employed the same Presbyterian chaplain for sixteen years did not violate the Establishment Clause "[a]bsent proof that the chaplain's reappointment stemmed from an impermissible motive." *Id.* at 793. As for the practice of paying the chaplain a salary with public funds, that too was constitutionally permissible because "remuneration is grounded in historic practice initiated . . . by the same Congress that drafted the Establishment Clause of the First Amendment." *Id.* at 794. Finally, the Court made clear that it was not interested in scrutinizing the substance of the prayers themselves:

> The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

*Id.* In *Marsh*, the Supreme Court thus made clear that legislative prayer is entitled to special deference under the Establishment Clause. That deference, however, is not without limit—when legislative prayer is employed to advance or disadvantage a specific faith or belief, such government affiliation with religion might, in certain cases, run afoul of constitutional proscriptions. *See id.*; *County of Allegheny v. Am. Civil Liberties Union.*, 492 U.S. 573, 611 (1989) (explaining that "legislative prayers that have the effect of affiliating the government with one specific faith or belief" violate the Establishment Clause) (citing *Marsh*, 463 U.S. at 794-795).

13

Twenty-five years after *Marsh*, the Eleventh Circuit had the opportunity to further enunciate the constitutional principles at issue in cases of legislative prayer in *Pelphrey v. Cobb County*. In *Pelphrey*, a group of taxpayers challenged the prayer practices of both the Cobb County Commission and the Cobb County Planning Commission. 547 F.3d at 1267. Both bodies had "a long tradition of opening their meetings with prayer by volunteer clergy invited by County personnel on a rotating basis." *Id.* The plaintiffs contended that 96.6 percent of the clergy selected to speak between 1998 and 2005 were Christian, but the record reflected that during that same time period members of the Jewish, Unitarian Universalist, Muslim, and Bahá'í faiths had also performed opening invocations. *Id.* Throughout the decade preceding litigation, the court noted that 70 percent of the County Commission prayers and 68 percent of the Planning Commission contained Christian references, but that there were also "occasional" references to the Jewish and Muslim faiths. *Id.* Invocation speakers were not paid to present the prayers, though the County expended municipal funds in selecting, inviting, and thanking the speakers, and a county employee had personal autonomy to select the actual speakers that would appear.[2] *Id.*

In *Pelphrey*, the court first reaffirmed *Marsh*'s teaching that the area of legislative prayer is "excepted from the traditional analysis under the Establishment Clause," i.e., the *Lemon* test. *Id.* at 1269. In analyzing whether legislative prayer had been exploited to advance or disparage a particular creed, the court analyzed the nature or content of the prayers themselves, the identity of the speakers, and the selection procedures employed by the County. *Id.* at 1277. Ultimately, the court rejected the plaintiffs' argument that

---

[2] As noted earlier, by the time the Eleventh Circuit considered the question, both the County Commission and the County Planning Commission had discontinued their previous practice and instead employed "a master list to select randomly a speaker to offer the prayer at a meeting." *Id.* at 1268.

14

the sectarian nature of the prayers at issue rendered them constitutionally repugnant. *Id.* at 1271 ("The taxpayers argue that *Allegheny* requires us to read *Marsh* narrowly to permit only nonsectarian prayer, but they are wrong."). That said, the sectarian or nonsectarian nature of the prayers at issue is "one factor in this fact-intensive analysis." *Id.* And while the Eleventh Circuit in *Pelphrey* declined to parse the content of the actual prayers, it noted that the content of the prayers might become an issue for judicial scrutiny upon a showing that the prayer practice was used to advance one particular faith or belief. *Id.* at 1278.

After finding that most of the County's practices were well within the confines of *Marsh*, the *Pelphrey* court next analyzed the County Planning Commission's selection procedure in order to determine if it violated *Marsh*'s prohibition on selecting speakers based upon an "impermissible motive," that is, "based on [their] particular beliefs." *Id.* at 1281. Because the deputy clerk of the Planning Commission had been issuing invitations to speakers using a phone book with lines drawn though certain categories of faiths (e.g., "Churches-Islamic," "Churches-Jehovah's Witnesses," etc.) and no speakers from those faiths had been invited to offer a prayer during the relevant time period, the court held that the selection practice "categorically excluded" certain faiths and was unconstitutional. *Id.* at 1282.

Applying the dictates of *Marsh* and *Pelphrey* to the facts of the case at bar, the Court must bear in mind that "'Establishment Clause challenges are not decided by bright-line rules, but on a case-by case basis with the result turning on the specific facts.'" *Pelphrey*, 547 F.3d at 1268 (quoting *Glassroth v. Moore*, 335 F.3d 1282, 1288 (11th Cir. 2003)); *see King v. Richmond Cnty.*, 331 F.3d 1271, 1276 (11th Cir. 2003) (explaining that the evaluation of Establishment

Clause challenges "calls for line-drawing based on a fact-specific, case-by-case analysis").

Plaintiffs allege that thirty-three of the thirty-four invocation speakers for the Lakeland City

Commission since May 18, 2009 have been Christian and that the one non-Christian speaker was

asked to offer a prayer essentially as a tactic in preparation for this litigation. (Doc. 10, Doc. 21).

Defendants contend that, whatever may have previously been the case, because Resolution 10-

041 was specifically tailored to meet the requirements of *Pelphrey*, Plaintiffs cannot prevail.

Defendants' argument, which essentially rehashes its mootness attack, misses the point. At the

motion to dismiss stage, this Court first disregards any legal conclusions contained in the

Plaintiffs' complaint and then, taking the well-pleaded facts as true, determines whether "they

plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950; *see Am. Dental Ass'n*,

605 F.3d at 1289.

Thus, the dispositive issue at this juncture is whether Plaintiffs allege sufficient facts such

that it is "plausible" to believe that the City of Lakeland exploited a prayer practice "'to

proselytize or advance any one, or to disparage any other, faith or belief.'" *Pelphrey*, 547 F.3d at

1270 (quoting *Marsh*, 463 U.S. at 795). Given the sheer number of Christian prayers (and the

timing of the only non-Christian speaker) and the potential that Plaintiffs might demonstrate

either "categorical exclusion" of non-Christians or an "impermissible motive" in the City's

selection process, the Court reluctantly concludes that Plaintiffs have alleged facts that could

"plausibly give rise to an entitlement to relief." *Iqbal*, 129 S. Ct. at 1950. The Court's decision

is bolstered in that the fact the "fact-intensive analysis" upon which summary judgment will turn

requires discovery—after all, the "smoking gun" phone book in *Pelphrey*, in which various

categories had been struck through and which ended up being pivotal to the plaintiffs' limited

success, could only have been located through the process of discovery. *Id.* at 1267. Finally,

16

the fact that Plaintiffs not only contend that Lakeland's official policy is unconstitutional, but also that the City maintains a custom and practice that violates constitutional prescriptions, renders Plaintiffs' allegations regarding the purposeful exclusion of non-Christian believers from Lakeland's invocation practice sufficient to defeat the motion to dismiss as to Count I. The Court, however, admonishes Plaintiffs that the failure to present greater factual support for their assertions after appropriate discovery will result in serious challenges at the summary judgment stage.

## 2.  Florida Constitution Establishment Clause

Having dispensed with Defendants' motion to dismiss the federal Establishment Clause claim, the question of Plaintiffs' Florida Establishment Clause contention falls neatly in place. The Establishment Clause of the Florida Constitution provides:

> There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof. Religious freedom shall not justify practices inconsistent with public morals, peace or safety. No revenue of the state or any political subdivision or agency thereof shall ever be taken from the public treasury directly or indirectly in aid of any church, sect, or religious denomination or in aid of any sectarian institution.

Fla. Const. art. I, § 3.  Both Defendants' Motion to Dismiss and Plaintiffs' response thereto correctly acknowledge that the Florida Constitution's Establishment Clause is duplicative in many respects of the Federal Constitution's Establishment Clause. *See* Doc. 21, at 15 ("The same facts supporting Plaintiffs' First Amendment claim also support the Florida Constitutional claim."); Doc. 15, at 14 (attacking Plaintiffs' complaint "[p]rincipally" because "the invocations are permissible under the Establishment Clause of the First Amendment of the United States Constitution," and then adding further defenses to the more expansive "no aid" provision of the Florida Constitution). The Florida Constitution not only replicates the U.S. Constitution's Establishment Clause, but also imposes additional restrictions on state sponsorship of religious

activities through the "no aid" provision. *See Bush v. Holmes*, 886 So.2d 340, 344 (Fla. Dist. Ct. App. 2004), *aff'd in* part, 919 So. 2d 392 (Fla. 2006) ("For a court to interpret the no-aid provision of article I, section 3 as imposing no further restrictions on the state's involvement with religious institutions than the Establishment Clause, it would have to ignore both the clear meaning and intent of the text and the unambiguous history of the no-aid provision."); *Council for Secular Humanism v. McNeil*, 44 So.2d 112, 119 (Fla. Dist. Ct. App. 2010), *rev. denied*, 41 So.3d 215 (Fla. 2010) (explaining that the first sentence of the Florida Establishment Clause is consistent with the federal Establishment Clause, but that the "no aid" provision imposes further restrictions on state actors within Florida). Therefore, given that that Plaintiffs' federal Establishment Clause claim (Count I) survives Defendants' motion to dismiss, it *necessarily* follows that the Florida Establishment Clause claim (Count II) also overcomes Defendants' challenge.

### 3. Equal Protection and Freedom of Speech

Plaintiffs' contentions under the Equal Protection Clause of the Fourteenth Amendment and the Free Speech Clause of the First Amendment rest on far shakier ground. It seems plain that "'there is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect.'" *Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 302 (2000) (emphasis in original) (quoting *Board of Ed. of Westside Cmty. Sch. (Dist. 66) v. Mergens,* 496 U.S. 226, 250 (1990) (opinion of O'Connor, J.)). In the extant case, Plaintiffs themselves concede that "[t]he prayers at issue are government speech." (Doc. 10, ¶ 45). However, government speech, such as the Lakeland City Commission prayer invocations, is "subject only to the proscriptions of the Establishment Clause." *Simpson v. Chesterfield Cnty. Bd. of*

*Supervisors*, 404 F.3d 276, 288 (4th Cir. 2005) (internal quotation marks omitted) (citing

*Rosenberger v. Rector*, 515 U.S. 819, 833 (1995)).

The proper analytical device in this case is the Establishment Clause, and not the Equal

Protection or Free Speech clauses—Plaintiffs' recouching their true claim (alleging a violation of

the Establishment Clause) as a different constitutional species therefore changes nothing.

Plaintiffs impliedly admit as much: for example, Plaintiffs cite only two cases under the Equal

Protection subheading of their responsive pleading (Doc. 21), and neither of those cases is

actually an Equal Protection case. *See Everson v. Bd. of Ed. of Ewing Twp.*, 330 U.S. 1, 4 n.2

(1947) ("Appellant does not challenge the New Jersey statute or the resolution on the ground that

either violates the equal protection clause of the Fourteenth Amendment by excluding payment

for the transportation of any pupil who attends a 'private school run for profit.'"); *Church of*

*Lukumi Bablu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 528 (1993) (noting that the case was

brought under Free Exercise Clause of the First Amendment). Therefore, Plaintiffs' concession

that the prayers at issue here are government speech is simultaneously a recognition that the

Establishment Clause, and the Establishment Clause only, governs the conduct at issue in this

case. Thus, they have failed to state a claim under the Equal Protection Clause or the Free

Speech Clause and Defendants' Motion to Dismiss Counts III and IV is granted.

### C. **Qualified Immunity**

Defendants also urge this Court to dismiss all claims against Lakeland Mayor Gow Fields

because, at least according to Defendants, Defendant Fields enjoys qualified immunity from suit.

Defendants' contentions are misplaced: at this point, it is axiomatic that the qualified immunity

"defense is not available . . . [in] § 1983 cases where injunctive relief is sought instead of or in

addition to damages." *Pearson v. Callahan*, 129 S. Ct. 808, 822 (2009); *see Fortner v. Thomas*,

983 F.2d 1024, 1029 (11th Cir. 1993). Plaintiffs request injunctive and declaratory relief in addition to nominal damages on all counts; consequently, qualified immunity will not lead to Defendant Fields' outright dismissal from this case. (Doc. 10).

In addition, and as Plaintiffs correctly note, qualified immunity does not protect officials from claims alleging violations of state law. *D'Aguanno v. Gallagher*, 50 F.3d 877, 879 (11th Cir. 1995) ("Because qualified immunity is a defense only to federal claims, we hold that the district court erred in concluding that defendants were entitled to qualified immunity on the claims for violations of state law." (citing *Andreu v. Sapp*, 919 F.2d 637, 640 (11th Cir. 1990)). Therefore, Defendant Fields enjoys no qualified immunity with regard Count II of Plaintiffs' Complaint (Doc. 10), which alleges violations of the Establishment Clause of the Florida Constitution.

Qualified immunity, however, may well protect Defendant Fields from a judgment of nominal money damages. *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "Qualified immunity shields government officials who perform discretionary governmental functions from civil liability so long as their conduct does not violate any 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Rehberg v. Paulk*, 611 F.3d 828, 838 (11th Cir. 2010) (quoting *Harlow*, 457 U.S. at 818). Decisions regarding qualified immunity "should be considered at the earliest possible stage of a litigation." *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987); *see Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). Therefore, the dispositive question for this Court in assessing Defendant Fields' immunity from damages is whether, taking all of Plaintiffs' allegations as true, the Plaintiffs' complaint alleges the violation of a clearly established constitutional right. *Gonzalez v. Reno*, 325 F.3d 1228, 1233 (11th Cir. 2003). "For a constitutional right to be clearly established, 'its contours must be

20

sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (quoting *Anderson*, 483 U.S. at 640).

Plaintiffs allege that Defendant Fields engaged in the categorical exclusion of non-Christians from the Lakeland City Commission's opening prayers. Given the clear teachings of *Marsh* and *Pelphrey*, such allegations are sufficient to allege a violation of Plaintiffs' clearly established federal rights. After all, Defendant Fields' involvement in the passage of Resolution of 10-041, which cites to *Marsh* and *Pelphrey*, indicates that he was aware of the relevant Eleventh Circuit and Supreme Court precedent during the time periods relevant to this litigation, and a violation of the constitutional guidelines set down in those cases would therefore mean that Defendant Fields had "knowingly violate[d] the law," thus rendering the qualified immunity defense unavailable to him. *Malley v. Briggs*, 475 U.S. 341 (1986). Put simply, if Plaintiffs' accusations that Defendant Fields executed a policy of categorically excluding non-Christians from Lakeland City Commission Meetings are true, then Defendant Fields will not be shielded from Plaintiffs' nominal damages claims by qualified immunity. To the extent that Defendant Fields challenges the truth of Plaintiffs' factual allegations, a motion for summary judgment is the proper mechanism by which to dispute those contentions, and this Court is vested with discretion under Federal Rule of Civil Procedure 26 to "tailor discovery narrowly" to the particular question of qualified immunity if Defendants so desire.[3] *Crawford-El v. Britton*, 520 U.S. 574, 598-599 (1998).

In sum, Plaintiffs' claims for injunctive relief will require this Court to reach the pure constitutional question with regard to Defendant Fields notwithstanding whether he will ultimately be qualifiedly immune from damages. On the facts of this case, however, that

---

[3] Insofar as Plaintiffs' claims for injunctive relief against Defendant Fields survive the instant motion, however, Plaintiffs will likely be permitted to conduct normal discovery with regard to those claims. Therefore, the practical effect such limitations might actually have on the overall scope of discovery is unclear.

analysis is best undertaken at summary judgment, not on the instant motion to dismiss.
Accordingly, Defendants' Motion to Dismiss Defendant Fields from this case in his individual
capacity is denied.

### D. Duplicative Claims Against Fields and the City

Defendants finally argue that the claims against Defendant Fields in his official capacity
are duplicative of Plaintiffs' claims against the City and must therefore be dismissed. As
Defendants correctly note, as long as a local government receives notice and the opportunity to
respond, "an official-capacity suit is, in all respects other than name, to be treated as a suit
against the entity." *Kentucky v. Graham*, 473 U.S. 159, 169-170 (1985) (citing *Brandon v. Holt*,
469 U.S. 464, 471-472 (1985)).  Therefore, because Plaintiffs assert identical claims against the
City itself, those claims against Defendant Fields in his official capacity are "redundant" and
must be dismissed. *Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991).  Insofar as
Plaintiffs seek a remedy from Defendant Fields himself, the survival of their claims against him
in his individual capacity provides the proper avenue for the pursuit of such relief. *E.g. Hafer v.
Melo*, 502 U.S. 21, 25 (1991). Accordingly, it is:

**ORDERED** that Defendants', City of Lakeland and Gow Fields, Motion to Dismiss (Doc. 15) be **GRANTED IN PART**, as to Counts III and IV of the First Amended Complaint, and **DENIED IN PART**, as to Counts I and II. Additionally, Defendants' Motion to Dismiss the claims against Defendant Fields is **GRANTED** as to the claims brought against him in his official capacity and **DENIED** as to the claims brought against him in his individual capacity. The Defendants have ten (10) days from this date to answer the complaint.

**DONE AND ORDERED** in Chambers, in Tampa, Florida this 15th of March, 2011.



ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies to: All parties and counsel of record.