UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ATHEISTS OF FLORIDA, INC., and
ELLENBETH WACHS,

     Plaintiffs,

     v.   ·                      Case No. 8:10-cv-1538-T-17-MAP

CITY OF LAKELAND, Florida and
MAYOR GOW FIELDS,

     Defendants.

_____/

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

     This cause is before the Court on Defendant Gow Fields' Motion for Summary Judgment (Dkt. 30), Defendant City of Lakeland's Motion for Summary Judgment (Dkt. 34), Plaintiffs Atheists of Florida, Inc. and Ellenbeth Wachs' Motion for Summary Judgment (Dkt. 46), and the responses thereto (Docs. 49, 51, 52) . For the reasons set forth below, Defendants' Motions for Summary Judgment are **GRANTED** and Plaintiffs' Motion for Summary Judgment is **DENIED**.

## PROCEDURAL HISTORY

     Plaintiffs, Atheists of Florida, Inc. and Ellenbeth Wachs (hereinafter "Plaintiffs"), filed their First Amended Verified Complaint on August 18, 2010, challenging Defendants, City of Lakeland and Mayor Gow Fields' (hereinafter collectively referred to as "City" or "Defendants"), practice of allowing religious ministers to perform invocations before each meeting of the Lakeland City Commission.  Atheists of Florida is a non-profit organization that "seeks freedom of and from religion [and] equal treatment under the law." (Dkt. 10, ¶15).

Plaintiff Ellenbeth Wachs is the Director of the Lakeland Chapter of the Atheists of Florida. Plaintiffs assert violations of 42 U.S.C. § 1983 with regard to the Establishment Clause (Count I), the Equal Protection Clause (Count III), and the Freedom of Speech Clause (Count IV) of the United States Constitution, and also set out a claim under the Establishment Clause of the Florida Constitution (Count II). Plaintiffs allege that the City directs and controls the "content of prayers" through the selection process and that those citizens attending City Commission meetings "are effectively forced to stand and bow their heads and either acknowledge and express approval of the prayers, or be singled out." (Dkt. 10, ¶148). Plaintiffs seek declaratory relief pronouncing the Lakeland City Commission's invocation practice unconstitutional, injunctive relief preventing Defendants from continuing the practice, nominal money damages, and attorney's fees pursuant to 42 U.S.C. § 1988. In an order dated March 15, 2011, this Court granted Defendants' Motion to Dismiss with regard to Counts III and IV of the complaint, leaving only Counts I and II for resolution here. *Atheists of Fla., Inc. v. City of Lakeland*, 779 F. Supp. 2d 1330, 1332 (M.D. Fla. 2011). After extensive discovery, the parties submitted the instant cross-motions for summary judgment.

## STATEMENT OF FACTS

For many years, the Lakeland City Commission has begun each of its bi-monthly meetings with a prayer invocation.[1] Plaintiffs have attended these meetings in the past and viewed them over the Internet; they thus claim to have been subjected to unwelcome endorsement of religion "with government imprimatur." (Dkt. 10, ¶ 21).

From 1980 until 1995, invocation speakers were invited to Commission meetings by Carol Hoffman ("Hoffman"), an administrative employee who worked in the office of the City

---

[1] Though it is unclear exactly when the practice of opening Lakeland City Commission meetings with prayer and invocation began, the minutes to the June 19, 1951 meeting include mention of an invocation. (Koos Aff. Ex. 2).

2

Manager from 1975 to 1995. (Hoffman Dep. 7:6–13). Hoffman scheduled invocation speakers by referencing "a list from the prior secretary to the mayor," but exactly how her list originated is unclear. (Hoffman Dep. 18:1–5). Though Hoffman's list was limited to places of worship with a Lakeland address, she attempted to vary the religious denominations invited to give the invocation: indeed, "every commission meeting [she would] have a different denomination" offer the invocation. (Hoffman Dep. 22:7–11).

Hoffman's deposition testimony indicates that, during the twenty-year period in which she organized invocation speakers, she invited mostly Christian religious leaders, but also "[h]ad one pastor from the Universal Unitarian Church." (Hoffman Dep. 16:10–14). Hoffman also indicated that a Jewish religious leader from Temple Emanuel gave the invocation at various points throughout the 1980s, but that "there came a time when he retired . . . [a]nd they got a new rabbi [who] . . . for whatever reason . . . did not want to do it" and was therefore taken "off the list." (Hoffman Dep. 23:25–24:16). The evidence corroborates this account: City Commission meeting minutes from 1979 through 1985 show that Rabbi Mordecai Levy of Temple Emanuel provided the invocation at fourteen different Commission meetings between 1979 and 1985.

The City continued to follow the same practice following Hoffman's retirement. For example, from October 2003 to October 2005, Cher Gill ("Gill"), an administrative assistant in the City Manager's office, was responsible for scheduling invocation speakers. Gill's predecessor, a woman named "Joy," instructed Gill as to how to schedule invocation speakers, telling her to "pick it up from [where Joy had stopped] and do it on a fair rotation basis." (Gill Dep. 12:1–16:19). Joy instructed Gill to make sure that each speaker was from "within the city limits," (Gill Dep. 25:20–26:25), and Gill used the rotating list of denominations she had received from Joy to select each speaker: when it was a given denomination's

3

turn, she would "try to get in contact with somebody" from that denomination to give the invocation. (Gill Dep. 12:15–16:17; 22:4–9). Gill testified that each of the denominations on her rotating list were Christian, though she was unsure of what the category labeled "nondenominational" meant. (Gill Dep. 31:1–8).

The most detailed description of the City's practice with regard to the selection of invocation speakers was provided by the City employee currently responsible for planning invocation speakers, Traci Terry ("Terry"). Terry, a part-time Office Associate in the City Manager's office, has been responsible for scheduling invocation speakers since October 2005. (Terry Dep. 25:16–26:4). She was provided a "congregations list" shortly after beginning her employment with the City, and was instructed to "go down the list" and find someone from a different congregation to give the invocation at each meeting. (Terry Dep. 63:23–64:17). Terry did not update the list from October 2005 to March 2010. She did update the list in March 2010, at the direction of City Attorney Timothy McCausland. (Terry Aff. ¶6; Terry Dep. 62:22–67:1, 82:10–19).

The parties largely agree that the "congregations list" used by the City to schedule invocation speakers from 2002 to 2010 included only Christian denominations. *Compare* Dkt. 34, at 5 (noting that prior to 2010 "speakers were limited to those organizations on the list [Terry] was provided, which were almost exclusively Christian"), *with* Dkt. 49, at 4 (explaining that the list used from 2002 to approximately April 2010 excluded non-Christian religions). What is more, the invocation schedules from 2002 to May 2010 show that only Christian denominations (in addition to one invocation given each year by a "Captain" from the "Salvation Army" "denomination") were represented as invocation speakers at Lakeland City Commission meetings. (Terry Dep., Ex. 17, 18, 19, 28).

4

Beginning in March 2010, Plaintiffs began to complain to the City about the prayers at City Commission meetings. On March 15, 2010, Plaintiffs delivered a letter to Defendant Fields, Mayor of Lakeland, asking that the City dispense with its religious prayer practice and instead offer a "silent moment of reflection" to solemnize the Commission meetings. (Dkt. 10, Ex. 2). While Defendant Fields responded in a March 18 letter that "[t]he practice of opening Lakeland City Commission meetings with an invocation has a long history and will continue unless the City Commission decides it should be changed," he also defended the practice, explaining that "[e]very effort is made to ensure that those offering an inspirational message [are] representative of Lakeland's diverse religious community." (Dkt. 10, Ex. 3).

At about the same time, City Attorney McCausland undertook to reexamine the City's invocation practice. Starting in March 2010, he asked the City staff charged with inviting invocation speakers to City Commission meetings to update its list of potential invocation speakers. Terry then updated the list by using the Polk County Yellow Pages and the internet to research places of worship, including "churches or synagogues or mosques or temples or worship centers." (McCausland Dep. 21:13–18; *see* Terry Dep. 97:2–10). An invitation to deliver the invocation was then mailed to every religious congregation on the updated list, which includes some 600 religious congregations, the vast majority of which are Christian, but which also includes a Jewish synagogue, a Muslim mosque, Jehovah's Witness meeting halls, Unitarian Universalist churches, and a Hindu temple. (Terry Dep. Ex. 31).

On August 2, 2010, the Lakeland City Commission passed Resolution No. 4848, also known as Proposed Resolution 10-041 (the "Resolution"), for the purpose of "codifying its policy regarding invocations before meetings of the Lakeland City Commission." (Dkt. 10, Ex. 4). In the Resolution, the City explains that it "wishes to maintain a tradition of solemnizing its

5

proceedings by allowing for an opening invocation before each meeting, for the benefit and blessing of the Commission." (Dkt. 10, Ex. 4). The Resolution's recitals then lay out the relevant Supreme Court and Eleventh Circuit legal precedent regarding legislative prayer, and specifically state that "the Commission intends, and has intended in past practice, to adopt a policy that does not proselytize or advance any faith, or show any purposeful preference of one religious view to the exclusion of others." (Dkt. 10, Ex. 4)

In keeping with the City's new, post-March 2010 policy, the Resolution requires that an invitation to deliver the invocation at a City Commission meeting be mailed to each entry on the City's "Congregations List." This list is to "be compiled by referencing the listing for 'churches,' 'congregations,' or other religious assemblies in the annual Yellow Pages phone book(s) published for the Lakeland and Polk County[,] researched from the Internet, and consultation with local chambers of commerce." Further, "[a]ll religious congregations with an established presence in the local community . . . shall be[] included in the Congregations List. Any such congregation not otherwise identified for participation may request its inclusion by specific written communication to the Secretary." The Resolution then mandates that the invocation be removed from the official meeting agenda and provides that a disclaimer be placed on the meeting agenda clarifying that "the Commission is not allowed by law to endorse the religious beliefs or views of this, or any other speaker." Lastly, the Resolution requires that invitations be mailed within thirty days after passage and that the congregations list be updated every November thereafter. (Dkt. 10, Ex. 4).

Following the change of policy in March 2010, Cantor Victor Geigner of Temple Emanuel, a Jewish congregation, accepted the City's invitation to give the invocation on May 3, 2010. (Terry Dep. 167:9–16, Ex. 23). The City also apparently invited the Unitarian

6

Universalist Congregation of Lakeland to deliver the invocation in 2010, because the record contains two letters from the Unitarian Universalist Congregation declining the City's invitation to offer the invocation before the Lakeland City Commission. (Terry Dep. Ex. 8). Moreover, the 2011 invocation schedule includes two Jewish speakers and a Muslim Imam. (Terry Aff. Ex. 4). That said, Terry did not mail invitations within thirty days of the Resolution's passage or update the congregations list in November 2010, as was required by the Resolution. (Dkt. 34, ¶24). She indicated that she did not do so because an updated Yellow Pages had not yet been published by November 2010, and that any revision to the list would have therefore been futile. (Terry Dep. 26:21–27:9). After the publication of the new phone book in March 2011, Terry completed the second update and sent out invitations in May 2011. (Terry Dep. 36:11–25; Thomas Dep. 36:20–37:16; Terry Aff. ¶8).

Though it lacks precise data, the City estimates that the cost of preparing the congregations list and mailing out invitations is approximately $1,200 to $1,500 annually. (Thomas Dep. 124:14–19). Plaintiffs do not suggest that any religious or non-religious group has requested to deliver an invocation and been denied, but rather that the selection and invocation process itself, which necessarily excludes atheists and agnostics and results in a majority of Christian invocation speakers, embodies an unconstitutional affiliation of the City of Lakeland with the Christian faith. (Curry Dep. 104:2–20; Wachs Dep. 99:10–22).

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that summary judgment shall be granted if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Anderson v. Liberty Lobby, Inc.*,

447 U.S. 242, 249 (1986). The moving party bears the initial burden of stating the basis for its motion and identifying those portions of the record demonstrating the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). That burden can be discharged if the moving party can show the Court that there is "an absence of evidence to support the nonmoving party's case." *Id.* at 323, 325. When the moving party has met this initial burden, the nonmoving party must then designate specific facts showing that there exists some genuine issue of material fact in order to defeat summary judgment. *Id.* at 324. Though federal law will, of course, control the federal constitutional issue (Count I) in this case, when ruling on state-law claims, such as the claim relating to Florida Constitution (Count II), the Court must apply Florida law. *Erie R.R. v. Tompkins*, 304 U.S. 64, 78 (1938) (citing *Balt. & Ohio R.R. Co. v. Baugh*, 149 U.S. 368, 401 (1893)).

Issues of fact are "genuine" only if a reasonable jury, considering the evidence presented, could find for the nonmoving party. *Anderson*, 477 U.S. at 249. Material facts are those that will affect the outcome of the trial under governing law. *Id.* at 248; *Hickson Corp. v. Crossarm Co.*, 357 F.3d 1256, 1259–60 (11th Cir. 2004). In determining whether a material issue of fact exists, the court must consider all evidence in the light most favorable to the nonmoving party. *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983). If the determination of the case hinges on which competing version of the facts or events is true, the case should be submitted to the trier of fact and the motion for summary judgment denied. *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1531 (11th Cir. 1987). The weighing of evidence and the consideration of the credibility thereof are issues of fact to be determined by the jury at trial. *See Warrior Tombigbee Transp. Co. v. M/V Nan Fung*, 695 F.2d 1294, 1299 (11th Cir. 1983).

## DISCUSSION
### A. Federal Establishment Clause

Because the City pursued two essentially different prayer practices before and after March 2010, the Court will analyze each period separately. First, however, it makes sense to set forth the relevant legal principles that guide the Court's analysis of the City's invocation practices.

Pursuant to the Establishment Clause of the United States Constitution, "Congress shall make no law respecting an establishment of religion." U.S. Const. amend. I. "The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). The Supreme Court has only once before been confronted with the precise question presented in this case—namely, whether invocations or prayers before legislative bodies violate the Establishment Clause. *Marsh v. Chambers*, 463 U.S. 783 (1983).

### 1. The Supreme Court: *Marsh* and Its Progeny

In *Marsh*, the Supreme Court considered an Establishment Clause challenge to the Nebraska State Legislature's practice of beginning each of its sessions with a prayer offered by a chaplain paid from the public fisc. 463 U.S. at 784–785. The Court noted at the outset that "[t]he opening of sessions of legislative and other deliberative public bodies with prayer is deeply embedded in the history and tradition of this country." *Id.* at 786. Indeed, "the Continental Congress, beginning in 1774, adopted the traditional procedure of opening its sessions with a prayer offered by a paid chaplain." *Id.* at 787. The Court refused to apply the traditional establishment clause test provided by *Lemon v. Kurtzman*, 403 U.S. 602, 612–613 (1971), noting:

> On Sept. 25, 1789, three days after Congress authorized the appointment of paid chaplains, final agreement was reached on the language of the Bill of Rights.

Clearly the men who wrote the First Amendment Religion Clause did not view paid legislative chaplains and opening prayers as a violation of that Amendment, for the practice of opening sessions with prayer has continued without interruption ever since that early session of Congress.

*Marsh*, 463 U.S. at 788 (internal citations and footnote omitted).

Thus, and because "the practice of opening legislative sessions with prayer has become part of the fabric of our society," *id.* at 786, the fact that the Nebraska Legislature had employed the exact same Presbyterian chaplain for sixteen consecutive years did not violate the Establishment Clause, *id.* at 792–93. "Absent proof that the chaplain's reappointment stemmed from an impermissible motive, we conclude that his long tenure does not in itself conflict with the Establishment Clause." *Id.* The Court could not "perceive any suggestion that choosing a clergyman of one denomination advances the beliefs of a particular church." *Id.* at 793. As for the practice of paying the chaplain a salary with public funds, that too was perfectly acceptable in light of the fact that "remuneration is grounded in historic practice initiated . . . by the same Congress that drafted the Establishment Clause of the First Amendment." *Id.* at 794. "It can hardly be thought that in the same week members of the First Congress voted to appoint and to pay a Chaplain for each House and also voted to approve the draft of the First Amendment for submission to the States, they intended the Establishment Clause of the Amendment to forbid what they had just declared acceptable." *Marsh*, 463 U.S. at 790. Finally, and lest there have been any doubt, the Court made clear that it was not interested in scrutinizing the substance of the prayers themselves:

The content of the prayer is not of concern to judges where, as here, there is no indication that the prayer opportunity has been exploited to proselytize or advance any one, or to disparage any other, faith or belief. That being so, it is not for us to embark on a sensitive evaluation or to parse the content of a particular prayer.

*Id.* at 794–95. Put another way, the Supreme Court in *Marsh* made clear that legislative prayer is entitled to special deference under the Establishment Clause:

> In light of the unambiguous and unbroken history of more than 200 years, there can be no doubt that the practice of opening legislative sessions with prayer has become part of the fabric of our society. To invoke Divine guidance on a public body entrusted with making the laws is not, in these circumstances, an "establishment" of religion or a step toward establishment; it is simply a tolerable acknowledgement of beliefs widely held among the people of this country. As Justice Douglas observed, "[w]e are a religious people whose institutions presuppose a Supreme Being."

*Id.* at 792 (quoting *Zorach v. Clauson*, 343 U.S. 306, 313 (1952)).

That is not to say, however, that any and all legislative prayer is immune from Establishment Clause challenges under *Marsh*: when legislative prayer is "exploited to proselytize or advance any one, or to disparage any other, faith or belief," such government affiliation with religion might be constitutionally repugnant. *See id.* at 794–95; *Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 611 (1989) (explaining that "legislative prayers that have the effect of affiliating the government with one specific faith or belief" violate the Establishment Clause) (citing *Marsh*, 463 U.S. at 794–95).

In the years since it was decided, the Supreme Court has twice had occasion to expound upon its holding in *Marsh*. *See Allegheny*, 492 U.S. 572; *Lee v. Weisman*, 505 U.S. 577 (1992). In *Allegheny*, the Justices considered the ACLU's Establishment Clause challenge to the display of a crèche within a county courthouse and a menorah and Christmas tree display outside a different government building. A five-Justice majority ruled that the crèche was unconstitutional, rejecting Justice Kennedy's position (explained in dissent) that *Marsh* rendered the crèche acceptable. In doing so, the majority opined:

> However history may affect the constitutionality of nonsectarian references to religion by the government, history cannot legitimate practices that demonstrate the government's allegiance to a particular sect or creed.
>
> Indeed, in *Marsh* itself, the Court recognized that not even the "unique history" of legislative prayer can justify contemporary legislative prayers that have the effect of affiliating the government with any one specific faith or belief. The legislative prayers involved in *Marsh* did not violate this principle because the particular chaplain had "removed all references to Christ." Thus, *Marsh* plainly does not stand for the sweeping proposition Justice KENNEDY apparently that would ascribe to it, namely, that all accepted practices 200 years old and their equivalents are constitutional today. Nor can *Marsh,* given its facts and its reasoning, compel the conclusion that the display of the crèche involved in this lawsuit is constitutional. Although Justice KENNEDY says that he "cannot comprehend" how the crèche display could be invalid after Marsh, surely he is able to distinguish between a specifically Christian symbol, like a crèche, and more general religious references, like the legislative prayers in *Marsh.*

*Allegheny*, 492 U.S. at 603. Thus, the *Allegheny* majority suggested, albeit in dicta, that the

sixteen-year practice the Court had sanctioned in *Marsh* had been acceptable, at least in part,

because the chaplain had "removed all references to Christ"—in other words, had delivered only

nonsectarian prayers. *Id.*

Three years after *Allegheny*, the Court again had the opportunity to explicate the

constitutional underpinnings of its holding in *Marsh.* In *Lee v. Weisman*, the Court considered

an injunction prohibiting a public middle school from having benedictions and invocations at its

graduation ceremonies. 505 U.S. 577. The Court affirmed the injunction despite the fact that the

school principal had distributed a pamphlet to potential speakers that "recommend[ed] that

public prayers at nonsectarian civic ceremonies be composed with 'inclusiveness and

sensitivity'" and separately advised speakers that their benedictions and invocations should be

nonsectarian. *Lee*, 505 U.S. at 581. In fact, the Court indicated that the principal's attempts to

ensure the prayers be nonsectarian might *themselves* be constitutionally suspect:

> Principal Lee provided Rabbi Gutternamn with a copy of [the pamphlet] and advised him that his prayers should be nonsectarian. Through these means the

> principal directed and controlled the content of the prayers. Even if the only
> sanction for ignoring the instructions were that the rabbi would not be invited
> back, we think no religious representative who valued his or her continued
> reputation and effectiveness in the community would incur the State's displeasure
> in this regard. It is a cornerstone principle of our Establishment Clause
> jurisprudence that "it is no part of the business of government to compose official
> prayers for any group of the American people to recite as a part of a religious
> program carried on by the government," and that is what the school officials
> attempted to do."

*Id.* at 588 (quoting *Engel v. Vitale*, 370 U.S. 421, 425 (1962)). Thus, in *Lee* the Court echoed its

concern from *Marsh* that, in the absence of an "indication that the [invocation] opportunity ha[d]

been exploited to proselytize or advance any one, or to disparage any other, faith or belief," it

was not the role of government, including the federal courts, "to embark on a sensitive

evaluation or to parse the content of a particular prayer." *Marsh*, 463 U.S. at 794–95.

### 2. *Pelphrey*

The Eleventh Circuit has similarly had only one occasion to consider the constitutionality

of legislative prayer. *Pelphrey v. Cobb Cnty.*, 547 F.3d 1263 (11th Cir. 2008). The district court

in *Pelphrey* had originally considered the question of whether to issue a preliminary injunction

halting the invocation practices of two public bodies: the Cobb County Board of Commissioners

and the Cobb County Planning Commission. 410 F. Supp. 2d 1324 (N.D. Ga. 2006) (hereinafter

*Pelphrey I*). After setting forth its understanding of *Marsh*, *Allegheny*, and *Lee*, the court

explained that "while prayers at legislative gatherings are permissible, at some point the

government's provision of a prayer opportunity may breach a constitutionally tolerable line by,

for example, demonstrating a preference on the part of the government for a particular sect or

creed to the exclusive of other faiths." *Id.* at 1336. "While this Court does not purport to act as a

comprehensive cartographer of the permissible boundaries of legislative prayer, it takes this

opportunity, before focusing on the specific facts of this case, to articulate what it perceives as the standards that must guide its inquiry." *Id.*

The court first focused on the selection of invocation speakers, and noted that a relevant inquiry "relates to the intent of the legislature in its selection of the speaker meant to deliver the invocation." *Id. Marsh* had counseled that the sixteen-year tenure of the chaplain of the Nebraska state legislature was constitutional "[a]bsent proof that the chaplain's reappointment stemmed from an impermissible motive." 463 U.S. at 793. The district court in *Pelphrey I* noted that the Supreme Court had not elaborated on what would render a motive "impermissible," but explained that "the 'impermissible motive' prohibition seems directed at the conscious selection of a speaker from one denomination or sect for the purpose of promoting or endorsing the beliefs held by that speaker." 410 F. Supp. 2d at 1336. What is more, "the bar for proving such impermissible motive is quite high," given that the Supreme Court had "found the virtually uninterrupted sixteen year tenure of a single Presbyterian minister insufficient to demonstrate any 'preference' for a particular faith." *Id.* at 1337. Thus, according to the district court in *Pelphrey I*, the Supreme Court "appeared to envision more pronounced evidence of a legislative purpose to sanction one religious viewpoint as a necessary predicate for declaring a legislature's selection of clergy a violation of the Establishment Clause." *Id.* And "as *Marsh* itself made clear, [courts] cannot ascribe an impermissible motive to the legislature in its selection of clergy merely based on the disproportionate (or even exclusive) representation of one faith behind the invocational podium." *Id.* at 1346. Thus, nothing about the selection procedures rendered the plaintiffs likely to succeed on the merits of their claim. *Id.*

The court next explained that *Marsh* and its progeny would also prohibit the "exploitation of the allowance of an invocational opportunity by the legislature to promote the beliefs of one

religious sect, or to disparage those of any other; or the maintenance of a practice that conveys the impression that the government has purposely elected to prefer one religious view to the exclusion of other faiths." *Id.* Notably, where invocations are offered by various leaders of the local community, as opposed to members of the government body itself, such a "diluted nexus between the speaker and the governmental body . . . is not as likely to project onto the government. Rotation of the speaking opportunity among various denominations greatly undercuts the perception that the legislature has purposefully aligned itself with one religious viewpoint." *Id.* at 1345 (citing *Newdow v. Bush*, 355 F. Supp. 2d 265, 289 (D.D.C. 2005) (upholding sectarian references in inaugural prayers because, unlike in cases where "different perspectives on a supreme being were never given a voice," inaugural prayers often included at least two different clergypeople)). Thus, viewing the invocation practice as a whole, the court denied the preliminary injunction because the plaintiffs had not demonstrated a likelihood of success on the question of whether the defendants' invocation practices "resulted in the impermissible appearance of an official preference for one sect or creed to the exclusion of others."

Following discovery, the district court again revisited the case in ruling upon the parties' cross-motions for summary judgment. *Pelphrey v. Cobb Cnty.*, 448 F. Supp. 2d 1357 (N.D. Ga. 2006) (hereinafter *Pelphrey II*), *aff'd*, 547 F.3d 1263 (11th Cir. 2008). The record demonstrated that, between January 1988 and August 2005, "96.6% of the speakers providing the invocation at Commission meetings, to the extent their faith was discernable, were Christian." *Id.* at 1360 (internal quotation marks omitted). That said, and though the "overwhelming majority of invocational speakers" were Christian, "adherents to the Jewish and Unitarian Universalist faiths also provided invocations," and "a Muslim Imam from the County's only mosque" had "more

recently" offered a prayer. *Id.* Discovery revealed no evidence of pre-censorship with regard to the invited speakers' prayers, and the county had not directed speakers in any way regarding the content of their prayers. *Id.* Plaintiffs objected that the invocation practice was generally unconstitutional, and specifically complained that certain Cobb County Commissioners had been given lists of potential invocation speakers including a Hindu individual, a United Unitarian, an atheist, and a Jewish rabbi, but had failed to pass that information along to the administrative personnel tasked with selecting invocation speakers. *Id.* at 1364.

The court began its analysis by considering the identity of the invocation speakers and the content of their prayers, noting:

> [T]he fact that well over 90% of the speakers who provided the invocation over the past several years were Christian does little to advance Plaintiffs' case. In *Marsh* itself, the Supreme Court itself found nothing constitutionally impermissible in the nearly uninterrupted sixteen year tenure of one Presbyterian minister as chaplain for the Nebraska legislature. To find the high percentage of Christian speakers here renders the County's practices unconstitutional would be difficult to reconcile with that holding.

> Likewise, invitees' inclusion of sectarian references in their invocations does not, in the view of this Court, compel a finding of unconstitutionality.

*Pelphrey II*, 448 F. Supp. 2d at 1368–69 (internal citation omitted). Thus, and even though the speakers "surely convey[ed] *their* alignment with one religious creed to the exclusion of others," "viewed cumulatively [and] given the diversity in the denominations and faiths represented, it is difficult to extrapolate from any one speaker's affiliation a preference on the part of the Cobb County government." *Id.* at 1369 (emphasis in original). Given those principles and findings, the court found nothing constitutionally intolerable about the identity of the invocation speakers (96.6% Christian), nor their regular sectarian references. *Id.* at 1370. In fact, the court went further, explaining that "to read into the Establishment Clause an absolute proscription of sectarian references during legislative invocations would do violence to *Marsh.*" *Id.* at 1366.

16

The *Pelphrey II* court next moved to consider the procedures used in Cobb County to select the invocation speakers who were to appear, and noted at the outset that the Cobb County Board of Commissioners (the "Board") and the Cobb County Planning Commission (the "Planning Commissioner") had in fact employed two different selection procedures. *Id.* at 1361–62. The Board's invocation speakers had been selected by an administrative specialist who "compile[d] a list of religious organizations in Cobb County, which she pull[ed] from a variety of sources, including, *inter alia*, the Yellow Pages, the Internet (including the Chamber of Commerce website)," and other sources. *Id.* at 1362. That said, the evidence also indicated that the administrative assistant had received information regarding the County's mosque in 2004. Though there was "great diversity in denomination and cultural affiliation," the list was overwhelming Christian; it did, however, contain contact information for three Jewish Synagogues, a Unitarian Universalist Congregation, and a mosque. *Id.* Though the administrative assistant denied taking the beliefs held by any group into account, the evidence showed that she had received information about a Jehovah's Witness congregation, a Bahá'í assembly, and the Church of Jesus Christ of Latter Day Saints, though none of these had ever made it onto the list. *Id.* at 1362–63. The assistant deposed that her predecessor had told her that the Jehovah's Witnesses and the Church of Jesus Christ of Latter Day Saints had declined invitations to provide invocations, and that was ostensibly why they were omitted from the list. *Id.* at 1362 n.9. The list also omitted other religious groups that were located in Cobb County but not listed in the Yellow Pages, including a Buddhist Assembly, a Hindu Temple, three Messianic Jewish congregations, and a Christian Science church. *Id.* at 1363.

As for the Planning Commission, its list of potential invocation-givers was prepared by a deputy clerk who relied primarily on the Yellow Pages to generate her list, but had also

contacted the chaplain programs of the local police and fire departments. *Pelphrey II*, 448 F. Supp. 2d at 1363. The phone book used by the deputy clerk in 2003–2004 "shows a dark, straight, continuous, vertical line through the categories listed in the Yellow Pages surrounding 'Churches,'" but the categories "Churches-Islamic, Churches-Jehovah's Witnesses, Churches-Jewish, and Churches-Latter Day Saints" were struck through and crossed out. *Id.* "[N]one of the faith groups struck out in 2003–2004 copy of the phonebook were asked to provide an invocation during those years." *Id.* at 1364. The 2005 copy of the Yellow Pages did not contain those notations, and in fact had a star next to the county's only mosque as well as check marks next to each Jewish synagogue; the deputy clerk had invited both a synagogue and a mosque to provide the invocation in 2005, and at least one Jewish Rabbi performed the opening prayer that year. *Id.*

The court found the Board's selection procedures constitutional, explaining: "Contrary to what Plaintiffs suggest in their papers, 'diversity' among the faiths represented at legislative functions has never been the *sine qua non* of constitutional legitimacy." *Pelphrey II*, 448 F. Supp. 2d at 1371 (citing *Marsh*, 463 U.S. at 793–94). In fact, the court went on to suggest that purposeful discrimination is actually required before a particular selection procedure crosses constitutional boundaries: "Absent evidence that the phonebook was *purposefully* used as a device for stifling diversity, the Court discerns nothing troubling about selection procedures that rely, in whole or in part, on the Yellow Pages." *Id.* (emphasis supplied); *see Galloway v. Town of Greece*, 732 F. Supp. 2d 195, 217 (W.D.N.Y. 2010) (upholding practice as constitutional despite the selection of exclusively Christian speakers because "there is no evidence that [the administrative personnel who selected speakers] intentionally excluded non-Christians from giving prayers at Town Board meetings). With regard to the commissioners' failure to pass

18

along information of potential non-Christian speakers, the court explained that "[t]he record to which this Court has been directed is bereft of evidence" of an "improper motive." *Pelphrey II*, 448 F. Supp. 2d at 1371. Finally, the court explained that the faiths that were included on the Board's list were "quite diverse," and "[a]longside denominationally and culturally heterogeneous Christian organizations, [the list included] three synagogues, one Unitarian Universalist congregation, and the County's only mosque." *Id.* at 1372.

Though the court found the Board's practices constitutional, the Planning Commission's selection practice proved more problematic. *Id.* at 1373. Because the phonebook used from 2003–2004 had lines drawn through the non-Christian faiths, the court held that "certain faiths were categorically excluded from the list of prospective speakers based on the content of their faith." *Id.* For example, the clerk in charge of selecting Planning Commission speakers had struck through the entire entry in the phone book for Jehovah's witnesses after her invitation was refused by a single organization, though she only crossed out single Christian organizations if her invitation was refused (i.e., she did *not* strike through, and thus wholly exclude, the entire religious group based upon one declined invitation). *See id.* ("As it relates to other, 'traditional' Christian faiths, a leader's disinclination to provide the invocation on a particular occasion would result in a single mark or strike-through being placed next to his or her *particular* organization." (emphasis is original)). In light of the evidence that the Planning Commission purposefully discriminated against non-Christians, "not even 'the spacious boundaries set forth in *Marsh*'" could accommodate the practice, and the court held it unconstitutional. *Id.*

The Eleventh Circuit affirmed, lauding the district court for its "series of thorough, meticulous, and well-reasoned orders." *Pelphrey v. Cobb Cnty.*, 547 F.3d 1267, 1277 (11th Cir. 2008) (hereinafter *Pelphrey III*). The court noted at the outset that the area of legislative prayer

is "excepted from the traditional analysis under the Establishment Clause," i.e., the *Lemon* test. *Id.* at 1269. The court then rejected the plaintiffs' argument that the sectarian nature of the prayers at issue rendered them constitutionally repugnant. *Id.* at 1271 ("The taxpayers argue that *Allegheny* requires us to read *Marsh* narrowly to permit only nonsectarian prayer, but they are wrong."). Finally, the Eleventh Circuit construed *Marsh* "to forbid judicial scrutiny of the content of prayers absent evidence that the legislative prayers have been exploited to advance or disparage a religion," noting that for the court to assume the "role of ecclesiastical arbiter . . . would achieve a particularly perverse result." *Id.* at 1274 (internal quotation marks and citations omitted).

In reviewing the specific findings of the district court, the Eleventh Circuit first noted three relevant factors for determining the constitutionality of legislative prayers: "the identity of the invocational speakers, the selection procedures employed, and the nature of the prayers." *Id.* at 1277. Comparing the facts before it to the exclusivity of the sixteen-year Presbyterian tenure that had passed constitutional muster in *Marsh*, the court found that the Board's speakers represented "a wide cross-section of the County's religious leaders" despite the fact they were "predominantly Christian." *Id.* (internal quotation marks omitted). The court then agreed with the district court's finding that the Board's selection process was constitutional, noting that "[n]othing in the record suggests any improper motive" in the commissioners' failure to pass along the information about potential non-Christian invocation speakers, and that "this failure in communication did not rise to the level of an 'impermissible motive.'" *Id.* at 1278. Given the finding that there had been no exploitation of the prayer to advance any one faith or belief, the court refused to "evaluate the content of the prayers" and declared the practice constitutional. *Id.*

The Eleventh Circuit also affirmed the district court's finding that the Planning Commission's selection practice for 2003–2004 was unconstitutional. *Pehlphrey III*, 547 F.3d at 1281. Importantly for this case, however, it noted in doing so that the "impermissible motive standard does not require that all faiths be allowed the opportunity to pray. The standard instead prohibits purposeful discrimination." *Id.* (internal quotation marks omitted). At bottom, the court said, the pertinent inquiry is whether the government body "categorically excluded specific faiths based on their beliefs" and, in so doing, evinced a purposeful intent to discriminate against those faiths. *Id.* at 1282.

### 3. This Case: Applying *Marsh* and *Pelphrey*

Having sketched the legal landscape crafted by *Marsh* and *Pelphrey*, this Court will now apply it to the facts at hand. The City's invocation practices can best be broken down into two time periods: the post-March 2010 invocation practice and the pre-March 2010 invocation practice. For clarity and ease of analysis, the Court will consider each period in turn.

### a. *March 2010 to Present*

In light of the legislative prayer practices approved in *Marsh* and *Pelphrey*, it is plain that the City's current invocation practice is well within *Marsh* and *Pelphrey*'s command and is, therefore, patently constitutional. At the outset, the Court notes that, insofar as Plaintiffs are against the entire *institution* of legislative prayer, and despite Plaintiffs' vociferous protestations to the contrary, the institution of legislative prayer itself is indubitably constitutional. Dkt. 46, at 19 n.11 ("Plaintiffs believe that *Marsh* and *Pelphrey* were wrongly decided."); *see also Pelphrey I*, 410 F. Supp. 2d at 1336 (noting that "prayers at legislative gatherings are permissible"); *Van Orden v. Perry*, 545 U.S. 677, 699 (2005) (Brennan, J., concurring) ("Neither can this Court's other tests readily explain the Establishment Clause's tolerance, for example, of prayers that

21

open legislative meetings."). Further, and to the extent that Plaintiffs challenge the City's allowance of prayers of a *sectarian* nature as constitutionally intolerable, *Pelphrey* counsels that this argument too must fail. *See Pelphrey III*, 547 F.3d at 1271 ("The taxpayers argue that *Marsh* permits only 'nonsectarian' prayers for commission meetings, but their reading is contrary to the command of *Marsh* that courts are not to evaluate the content of the prayers absent evidence of exploitation."); *Gore v. Duggar*, 763 F. Supp. 1110, 1116 (M.D. Fla. 1989) (explaining that "this Court is, of course, bound by the Eleventh Circuit's interpretation"); *see also Pelphrey III*, 547 F.3d at 1266 ("The taxpayers argue that the Establishment Clause permits only nonsectarian prayers for the meetings of the commissions, but we disagree.").

But in addition to their institutional challenge to the practice of legislative prayer itself, Plaintiffs also wage a specific attack on the City's post-March 2010 invocation practice. And though Plaintiffs make much of the fact that the City did not update its list in November 2010 or remove the invocation from the agenda of each and every City Commission meeting following the passage of Resolution 4848, this argument misses the mark. Whether or not the City is properly followings its own resolution is not the question before this Court; rather, the only germane inquiry here is whether the City's post-Resolution invocation policy exploits the practice of legislative prayer to advance any one belief or faith. *See Marsh*, 463 U.S. at 794–95. For example, though the City did not update its congregations list in November 2010, the evidence shows that this delay was actually due to the fact that in November no new Yellow Pages had yet been published since the City's most recent update in March 2010. (Terry Dep. 26:21–27:9). And following the publication of the new phone book in March 2011, Terry promptly updated the congregations list and mailed out new invitations in May. (Terry Dep. 36:11–25; Thomas Dep. 36:20–37:16; Terry Aff. ¶8). Thus, and while perhaps of tangential

relevance, the City's failure to adhere perfectly to its own ordinance does not talismanically render its post-March 2010 practice violative of the Establishment Clause. Rather, *Pelphrey*'s teaching is that the Court should examine three factors in determining the constitutionality of the City's post-March 2010 invocation practice: "the identity of the invocational speakers, the selection procedures employed, and the nature of the prayers." 547 F.3d at 1277. Those factors guide this Court's analysis here.

Beginning with the identity of the speakers, the undisputed evidence demonstrates that, since the change of policy in 2010, the City had one Jewish cantor deliver the invocation in 2010; moreover, two Jewish speakers and the Imam of Polk County's only mosque delivered the invocation in 2011. (Terry Aff. Ex. 4). This Court has previously taken judicial notice of the fact that the vast majority of religious organizations in Lakeland are Christian. (Dkt. 53). Thus, the factual situation here is nearly identical to that which the Eleventh Circuit held constitutional in *Pelphrey III*:

> Although the majority of speakers were Christian, the parties agree that prayers were also offered by members of the Jewish, Unitarian, and Muslim faiths. This diversity of speakers, in contrast with the chaplain of one denomination allowed in *Marsh*, supports the finding that the County did not exploit the prayers to advance any one religion.

547 F.3d at 1278. Moreover, and though this Court wholeheartedly agrees with the Eleventh Circuit that "[w]hether invocations of 'Lord of Lords' or 'the God of Abraham, Isaac, and Mohammad' are 'sectarian' is best left to theologians, not courts of law," *id.* at 1267, the Court points out that not all of the prayers quoted in Plaintiffs' papers are identifiable with any particular religion at all—many are, in fact, arguably nonsectarian or even ecumenical. *See* Dkt. 46, at 9–13 (excerpting various invocations to which Plaintiffs object); *see Pelphrey III*, 547 F.3d

at 1272 ("We would not know where to begin to demarcate the boundary between sectarian and nonsectarian expressions.").

Turning to the post-March 2010 selection process, that too is plainly constitutional, and the Court need not belabor this point. After all, the Eleventh Circuit in *Pelphrey III* expressly approved of the use of the 2005 Yellow Pages, which had none of the crossed-out congregations that had proved problematic in the 2003–2004 version. Here, the record demonstrates that in March 2010 and again in May 2011, an invitation to give the invocation was mailed to every religious congregation on the updated congregations list, including a Jewish synagogue, a Muslim mosque, Jehovah's Witness meeting halls, Unitarian Universalist churches, and a Hindu temple. (Terry Dep. Ex. 31; Terry Aff. Ex. 2). Further, a quick reference of the copy of the Yellow Pages used by Terry to create her updated congregations list shows that the Unitarian congregation, the Islamic mosque, the Judaic synagogues, the Messianic synagogue, and the Hindu temple are *all highlighted* in the exact same way that the Christian Yellow Book entries are. (Terry Aff. Ex. 1).

At any rate, and given the clearly inclusive nature of the City's new invocation practice, the Court is of the view that Plaintiffs have not presented a genuine issue of material fact sufficient to defeat summary judgment as to the City's post-March 2010 invocation practice. *See Pelphrey II*, 448 F. Supp. 2d at 1369 (holding that the inclusion of diverse faiths in invocation schedules "militates strongly against a finding that the practice violates the mandates of the Establishment Clause"). This view is fortified by the fact that other courts have made short shrift of arguments attacking the constitutionality of nearly identical invocation policies. *See Rubin v. City of Lancaster*, 802 F. Supp. 2d 1107, 1108, 1115 (C.D. Cal. 2011) (holding a strikingly similar invocation practice constitutional); *Galloway*, 732 F. Supp. 2d at 238–39 (rejecting

constitutional challenge because "[t]he Town's prayer policy, to the extent that one exists, is to invite clergy from all denominations within the Town, without any guidance or restriction on the content of prayers").

### b. Pre-March 2010

There are two reasons why the City's Motion for Summary Judgment (Dkt. 34) must also be granted with regard to Lakeland's pre-March 2010 invocation practices. First, Plaintiffs have failed to adduce sufficient evidence to demonstrate a necessary precondition of liability under 42 U.S.C. § 1983—namely, that the constitutional injury alleged be caused by an "official policy" of the municipality—here, the City of Lakeland. *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690–92 (1978). Second, and even assuming *arguendo* that Plaintiffs had demonstrated that the pre-March 2010 invocation practices were undertaken pursuant to official policy under § 1983, Plaintiffs have failed to create a triable issue of fact as to whether the pre-March 2010 prayer practices were "exploited to proselytize or advance any one, or to disparage any other, faith or belief, or had the effect of affiliating the government with any one specific faith or belief." *Pelphrey III*, 547 F.3d at 1277 (internal quotation marks omitted).

### i. Mootness

Before proceeding to the merits of the issue, however, the Court first considers the City's argument that the pre-March 2010 invocations are moot. As the Court previously stated in its Order on Defendants' Motion to Dismiss:

> Article III, Section 2 of the United States Constitution extends federal jurisdiction only to live "cases" and "controversies." *Troiano v. Supervisor of Elections in Palm Beach Cnty.*, 382 F.3d 1276, 1281 (11th Cir.2004). "Put another way, 'a case is moot when it no longer presents a live controversy with respect to which the court can give meaningful relief.'" *Al Najjar v. Ashcroft*, 273 F.3d 1330, 1336 (11th Cir.2001) (quoting *Fla. Ass'n Rehab. Facilities, Inc. v. Fla. Dep't Health & Rehab. Servs.*, 225 F.3d 1208, 1216–1217 (11th Cir.2000)). Deciding a moot issue is the equivalent of issuing an advisory opinion and, therefore, is not within

25

the jurisdiction of Article III courts. *Friends of the Everglades v. S. Fla. Water Mgmt. Dist.,* 570 F.3d 1210, 1216 (11th Cir.2009) ("To decide questions that do not matter to the disposition of a case is to separate Lady Justice's scales from her sword. That we will not do." (citation omitted)). Thus, the court is *required* to dismiss a moot action for want of jurisdiction. *Seay Outdoor Adver., Inc. v. City of Mary Esther,* 397 F.3d 943, 946 (11th Cir.2005); *see Nat'l Adver. Co. v. City of Miami (Nat'l Adver. I* ), 402 F.3d 1329, 1332 (11th Cir.2005) (per curiam).

. . . Nonetheless, "it is well settled that 'a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice.'" *Friends of the Earth, Inc. v. Laidlaw Envtl. Services (TOC), Inc.,* 528 U.S. 167, 189, 120 S.Ct. 693, 145 L.Ed.2d 610 (2000) (quoting *City of Mesquite v. Aladdin's Castle,* 455 U.S. 283, 289, 102 S.Ct. 1070, 71 L.Ed.2d 152 (1982)). The repeal or replacement of a challenged law will moot a case only: (a) "'if subsequent events ma[k]e it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Coral Springs,* 371 F.3d at 1328 (quoting *Sec'y of Labor v. Burger King Corp.,* 955 F.2d 681, 684 (11th Cir.1992)); and (b) "where 'a superseding statute satisfies *all* the principles sought in an attack on the prior statute.'" *Naturist Soc'y, Inc. v. Fillyaw,* 958 F.2d 1515, 1520 (11th Cir.1992) (emphasis in original) (quoting *Johnson v. State,* 586 F.2d 387, 388 (5th Cir.1978)).

*Atheists of Florida, Inc. v. City of Lakeland,* 779 F. Supp. 2d 1330, 1335 (M.D. Fla. 2011). Here, Plaintiff's claim with regard to the City's past invocation practices is not moot. True enough, the City has changed its practice, but that is not dispositive. After all, the district court in *Pelphrey I* confronted an identical argument and rejected it out of hand, explaining:

To be sure, [the deputy clerk's selection] practice, even before she was shifted out of the position of deputy clerk, had changed. In the 2005 copy of the Yellow pages, no such line removes, e.g., the County's synagogues and its mosque from consideration, and it appears from the record that such organizations have now been extended invitations to offer invocations at Planning Commission meetings. But, it is well-established that "a defendant's voluntary cessation of a challenged practice does not deprive the federal courts of power to determine the legality of the practice." *See Ala. v. U.S. Army Corps of Eng'rs,* 424 F.3d 1117, 1131 (11th Cir. 2005). Rather, "[v]oluntary cessation of a challenged practice will moot a case if 'subsequent events made it absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur.'" *Id.* Here, the Court finds no such clarity, and accordingly holds that Plaintiffs are entitled to judgment in their favor insofar as they challenge the selection procedures employed by the Cobb County Planning Commission.

448 F. Supp. 2d at 1374 (citation omitted).

Here, too, the Court finds no such clarity that the City of Lakeland will not revive its challenged practice. This view is reinforced by the fact that the Eleventh Circuit, in reviewing *Pelphrey* on appeal, did not take issue with the district court's refusal to moot the past activity and considered the substantive merits, despite the fact that "the question of mootness is jurisdictional in nature [and] may be raised by the court sua sponte, regardless of whether the district court considered it or if the parties briefed the issue." *Nat'l Adver. I*, 402 F.3d at 1332. Because the instant controversy has not been reduced to "a mere abstraction" by the City's change of policy, Plaintiffs' claims are not moot. *See Fillyaw*, 958 F.2d at 1519–20 (rejecting mootness challenge where challenged regulations were amended during pendency of action). That is not to say, of course, that the City is not entitled to summary judgment on the merits— indeed, because Plaintiffs have failed to present a triable issue of fact as to § 1983 liability and as to the alleged unconstitutionality of the City's pre-March 2010 invocation practice, the City is entitled to summary judgment in any event.

ii.    Section 1983

To prevail on a claim against a municipality under § 1983, a plaintiff must prove that actions taken under color of state law deprived him or her of a constitutional or statutory right, and that an official policy—"a municipal policy of some nature"—caused the constitutional tort. *Monell*, 436 U.S. at 691. "In other words, a municipality may not be found liable simply because one of its employees committed a tort." *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997). In the absence of an official policy permitting a constitutional violation, a plaintiff "must show that the [municipality] has a custom or practice of permitting it and that the [municipality's] custom or practice is 'the moving force [behind] the constitutional violation.'" *Grech v. Clayton Cnty.*, 335 F.3d 1326, 1329-1330 (11th Cir. 2003) (last alteration in original)

(quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). "To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice. Moreover, actual or constructive knowledge of such customs must be attributed to the governing body of the municipality." *Depew v. City of St. Marys*, 787 F.2d 1496, 1499 (11th Cir. 1986). Thus, "[i]n the absence of a series of constitutional violations from which deliberate indifference can be inferred, the plaintiff[] must show that the policy itself is unconstitutional." *Craig v. Floyd Cnty*, 643 F.3d 1306, 1311 (11th Cir. 2011) (internal quotation marks omitted); *see City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 130 (requiring a showing of the existence of an unlawful practice so permanent and well settled as to constitute a custom, and proof that such custom was so widespread and manifest as to imply acquiescence of the municipality's policymakers).

Turning to the extant case, it is undisputed that the City of Lakeland had no official policy with regard to invocations prior to August 2010, when Resolution 4848 was codified. Nor have Plaintiffs adduced any evidence whatsoever of any policymaking official that could arguably be said to have personally "exploited [the invocation practice] to proselytize or advance any one, or to disparage any other, faith or belief." *Marsh*, 463 U.S. at 794–95. Thus, the only possible basis for § 1983 liability would be if Plaintiffs could show "the existence of an unlawful practice by subordinate officials so permanent and well settled as to constitute a 'custom or usage' and proof that this practice was so manifest or widespread as to imply the constructive acquiescence of the policy-making officials." *Galloway*, 732 F. Supp. 2d at 218. That said, and despite the fact that Plaintiffs here allege a violation of clearly established federal law, they have adduced nothing whatsoever (other than conclusory allegations) to demonstrate that the City pursued an unofficial custom or practice "so widespread as to have the force of law" with regard to its invocation practice prior to March 2010. *Craig*, 643 F.3d at 1311. Nor have they shown

that City officials in any way ratified the allegedly unconstitutional actions of Hoffman, Gill, or

Terry, the City subordinates charged with carrying out the invocation practice prior to March

2010. *See Matthews v. Columbia Cnty.*, 294 F.3d 1294, 1297 (11th Cir. 2002) ("County liability

on the basis of ratification exists when a subordinate public official makes an unconstitutional

decision and when that decision is then adopted by someone who does have final policymaking

authority. The final policymaker, however, must ratify not only the decision itself, but also the

unconstitutional basis for it.") (internal citation omitted).

In fact, a complete review of the record reveals no evidence that policymaking officials

(such as Mayor Fields or City Manager Douglas Thomas) were ever aware that non-Christian

religious organizations were being allegedly excluded prior to March 2010.[2] *See, e.g.,* Fields

Dep. 145:11–14; Thomas Dep. 103:21–109:8. Further, even if various City officials were aware

of non-Christian religious groups, it does not necessarily follow that they were aware that

Hoffman, Gill, and Terry were excluding them from invitations to offer prayers. In fact, the

record reveals not one iota of such awareness by City officials. *See Galloway*, 732 F. Supp. 2d at

219 (granting summary judgment on that basis). To the contrary, the only evidence in the record

demonstrates that, *as soon as they became aware of a potential problem in March 2010*, City

officials moved quickly to rectify any potential constitutional infirmities and to pass a resolution

codifying the City's new, fully inclusive invocation policy. *See* McCausland Dep. 21:4–24;

36:9–17; Terry Dep. 97:2–10. At most, then, and even if Plaintiffs had shown that the City's

invocation practice prior to March 2010 was violative of the Establishment Clause (which, as

will be shown, they have not), such a showing would only demonstrate the actions of certain City

employees. But vicarious liability is insufficient in cases such as these; indeed, it is axiomatic

---

[2] Though City managerial officials may have been aware of the existence of Temple Emanuel, that congregation had declined the City's invitation to deliver the invocation in 1985. (Hoffman Dep. 23:25–24:16).

that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory," and the Defendants are therefore entitled to summary judgment as to the pre-March 2010 invocations. *Monell*, 436 U.S. at 691.

iii.  Establishment Clause

Even if Plaintiffs had made the proper showing of the custom or practice requisite to § 1983 liability, summary judgment would be appropriate nonetheless for a more fundamental reason: Plaintiffs have failed to present any evidence whatsoever showing that the pre-March 2010 prayers were "exploited to proselytize or advance any one, or to disparage any other, faith or belief." *Marsh*, 463 U.S. at 794–95. Again, the three factors enunciated in *Pelphrey III* control this Court's analysis: "the identity of the invocational speakers, the selection procedures employed, and the nature of the prayers." 547 F.3d at 1277.

At first blush, the most problematic facet of the City's pre-March 2010 invocation practice is the selection procedure: as Plaintiffs point out, Gill and Terry used a rotating list of denominations to devise the invocation schedule from 2002 to 2010, and those denominations on the list were exclusively Christian during that period. (Dkt. 46, at 4). It does not follow, however, that this selection procedure violates the Establishment Clause. That is so for several reasons. First, "'diversity' among the faiths represented at legislative functions has never been the *sine qua non* of constitutional legitimacy." *Pelphrey II*, 448 F. Supp. 2d at 1371. Rather, the pertinent inquiry is whether the selection of a given speaker was based upon an "impermissible motive." *Marsh*, 463 U.S. at 793. And as the Eleventh Circuit has made clear, the "'impermissible motive' standard does not require that all faiths be allowed the opportunity to pray. The standard instead prohibits purposeful discrimination." *Pelphrey III*, 547 F.3d at 1281. Simply put, Plaintiffs have produced no evidence whatsoever of a purposeful intent to

discriminate by any City employee. And the lack of any evidence as to Defendants' motives cannot be somehow counterfactually transmuted into positive evidence of a purposeful intent to discriminate. *See id.* at 1278 ("Nothing in the record suggests any improper motive on the part of the commissioners . . . ."). In fact, Hoffman, Gill, and Terry expressly denied being motivated by the religious persuasion of any potential speaker in planning the invocations. Finally, "[a]s *Marsh* itself made clear, this Court cannot ascribe an impermissible motive to the legislature in its selection of clergy merely based on the disproportionate (or even exclusive) representation of one faith behind the invocational podium." *Pelphrey I*, 410 F. Supp. 2d at 1346. That being so, and given the complete lack of evidence of a purposeful intent to discriminate, the City is entitled to summary judgment as to the constitutionality of its selection process in the pre-March 2010 period.

Turning to the "identity of the speakers" factor of the analysis, the same result obtains. *Pelphrey III*, 547 F.3d at 1277. Here, the dispositive question is whether the City "exploit[ed] the prayers to advance one faith." *Pelphrey III*, 547 F.3d at 1277. Plaintiffs have utterly failed to make such a showing. "In *Marsh* itself, the Supreme Court itself found nothing constitutionally impermissible in the nearly uninterrupted sixteen year tenure of one Presbyterian minister as chaplain for the Nebraska legislature." *Pelphrey II*, 448 F. Supp. 2d at 1368. "Where, as here, a legislature permits a variety of clergy to give invocations, there is arguably less likelihood that the government could be viewed as advancing a particular religion, and therefore less concern over the sectarian nature of particular prayers." *Galloway*, 732 F. Supp. 2d at 242. And far from attempting to proselytize or advance any one sect, the City here invited a vast array of "denominationally and culturally heterogeneous Christian organizations" to give the invocation in the pre-Marsh 2010 period. *Pelphrey II*, 448 F. Supp. 2d at 1372. For

example, the City's "2005 Invocational Schedule" includes speakers from the following "denominations" in the following order: Methodist, Pentecostal, Non-Denominational, Presbyterian, Baptist, Assembly of God, Presbyterian, Catholic, "Christian," Lutheran, Wesleyan, Baptist, "Chaplains," Methodist, Church of God, Baptist, Presbyterian, "Chaplains," Wesleyan, Non-Denominational, Pentecostal, "Salvation Army," Baptist, and Lutheran. (Terry Dep. Ex. 28). The other invocation schedules for the years 2002 to 2009 are similarly heterogeneous in their denominational variety. Additionally, Hoffman's undisputed testimony and the City Commission minutes reveal that, until a new rabbi joined the congregation in 1985 and declined the City's invitation to continue giving invocations, the City had a Jewish rabbi from Temple Emanuel offer the invocation some fourteen times in the six-year period from 1979 to 1985.[3] (Hoffman Dep. 23:25–24:16; Koos Aff. Ex. 3).

What is more, Plaintiffs have not pointed to any other non-Christian religious organizations in Lakeland (other than the previously discussed Temple Emanuel) available and willing to give an invocation during the relevant time period, 2002 to 2010. Surely the City cannot be expected to have invocation speakers from religious groups that decline its invitations to appear before the City Commission. The City need not have scoured the land for religious groups that cannot be shown to have existed within its boundaries at the relevant time. Taken to its logical conclusion, such an interpretation would erect an "absolute prohibition" on legislative prayer in smaller municipalities that lack the rich diversity enjoyed by many larger cities. *Cf. Pelphrey II*, 448 F. Supp. 2d at 1367. That cannot be—nor is it—the law. *See Pelphrey III*, 547

---

[3] To be sure, the City could have checked back with Temple Emanuel at some point between 1985 and when it revised its practice in 2010. And were negligence or carelessness the standard for determining constitutionality, that fact might be compelling. *Pelphrey* teaches, however, that Plaintiffs must make a far greater showing than negligence. *Pelphrey III*, 547 F.3d at 1277 (enunciating a standard whereby the key question is to "determine whether the prayers had been *exploited* to affiliate the [municipality] with a particular faith" (emphasis added)).

F.3d at 1271 (explaining that a reading of the Establishment Clause limiting legislative prayer to nonsectarian prayer "is contrary to the command of *Marsh*").

Plaintiffs admit that no person or group of any kind has ever been denied the opportunity to pray after requesting to offer the invocation at a City Commission meeting. Further, this Court has already taken judicial notice of the fact that the great majority of religious organizations in Lakeland are Christian, and in light of Plaintiffs' failure to adduce any evidence whatever of Defendants' alleged attempts at proselytization, there is nothing to say that the speakers from 2002 to 2010 did not in fact "represent[] 'a wide cross-section of the [City's] religious leaders.'" *Pelphrey III*, 547 F.3d at 1277 (quoting *Simpson v. Chesterfield Cnty. Bd. of Sup'rs*, 404 F.3d 276, 285 (4th Cir. 2005)); *see Galloway*, 732 F. Supp. 2d at 218 n.36 (explaining that "while all Christian denominations share a common heritage, they are hardly homogeneous," and noting that, "as the Court in *Pelphrey* recognized, the various Christian organizations are 'denominationally and culturally heterogeneous'"). Moreover, Plaintiffs have not suggested that the City ever attempted to direct or control the content of the prayers themselves, a factor that augurs against a finding of unconstitutionality. And compared to the sixteen-year tenure of a Presbyterian minister that the Supreme Court explicitly approved in *Marsh*, the City's pre-March 2010 invocation practice was quite inclusive of variegated religions and beliefs. Expounding upon the Fourth Circuit's decision in *Simpson*, the Eleventh Circuit in *Pelphrey III* noted "that invalidating a practice of prayer more inclusive than that upheld in *Marsh* 'would achieve a particularly perverse result'; a cramped reading of *Marsh* 'would push localities intent on avoiding litigation to select only one minister from only one faith.' That consequence would make 'America and its public events more insular and sectarian rather than less so.'" 547 F.3d at 1273 (quoting *Simpson*, 404 F.3d at 285). This Court wholeheartedly

agrees. *See Galloway*, 732 F. Supp. 2d at 240–41 (finding no intent to advance one religion despite solely Christian invocations where "a wide variety of Christian denominations were invited to deliver prayers" originally, and then, "after Plaintiffs complained, representatives of [other religions] volunteered to give invocations and were permitted to do so").

This Court has also considered the nature of the prayers themselves and finds that they did not "proselytize or advance any one, or disparage any other, faith or belief." *Marsh*, 463 U.S. at 794–95. Though Plaintiffs point to some prayers that reference "Jesus Christ" and could arguably be viewed as sectarian, others contain no reference to any "sectarian" deity at all. Dkt. 46, at 9–13 (listing invocations, many of which refer only generally to "God"); *see Pelphrey II*, 448 F. Supp. 2d at 1368–70. None of the prayers attempt to convert anyone to Christianity, disparage other religions or beliefs, or otherwise encroach upon *Marsh*'s boundary of constitutional impermissibility. *Galloway*, 732 F. Supp. 2d at 241 ("The mere fact that prayers may contain a reference to Jesus or another deity does not make them proselytizing."); *see Pelphrey I*, 410 F. Supp. 2d at 1339; *Snyder v. Murray City Corp.*, 159 F.3d 1227, 1234 n.10 (10th Cir. 1998) (explaining that, "[b]y using the term 'proselytize,' the [Supreme] Court indicated that the real danger in this area is effort by the government to convert citizens to particular sectarian views"). At bottom, then, other than their objection to the practice and institution of legislative prayer in and of itself, Plaintiffs lack any real evidence that the City's invocation practice was "exploited to advance one faith or belief." *Pelphrey III*, 547 F.3d at 1278. And insofar as Plaintiffs oppose the institution of legislative prayer itself, they are wrong—*Marsh* and *Pelphrey III* dictate otherwise. That being so, this Court "has no business 'in compos[ing] official prayers for any group of the American people to recite as a part of a

religious program carried on by government.'" *Id.* (quoting *Lee*, 505 U.S. at 588). The City's

Motion for Summary Judgment (Doc. 34) as to the pre-March 2010 is granted.

## B. Florida Constitution Establishment Clause

Having disposed of Plaintiffs' claim with regard to the federal Establishment Clause, it

follows that Plaintiffs' claim under the Florida Constitution fails, too. The Establishment Clause

of the Florida Constitution provides:

> There shall be no law respecting the establishment of religion or prohibiting or
> penalizing the free exercise thereof. Religious freedom shall not justify practices
> inconsistent with public morals, peace or safety. No revenue of the state or any
> political subdivision or agency thereof shall ever be taken from the public treasury
> directly or indirectly in aid of any church, sect, or religious denomination or in aid
> of any sectarian institution.

Fla. Const. art. I, § 3. "Florida courts adopt the federal interpretation of the First Amendment to

the extent that it tracks the Florida Constitution." *American Atheists, Inc. v. City of Starke*, No.

3:05-cv-977-J-MMH, 2007 WL 842673, at *7 (M.D. Fla. Mar. 20, 2007). Thus, to the extent the

Florida Constitution parallels the United States Constitution, the City's Motion for Summary

Judgment is granted for the reasons enumerated above. That said, the Florida Constitution

imposes some additional requirements beyond those required by the federal Constitution—

namely, the "no-aid" provision. *See Bush v. Holmes*, 886 So.2d 340, 344 (Fla. Dist. Ct. App.

2004), *aff'd in part*, 919 So. 2d 392 (Fla. 2006) ("For a court to interpret the no-aid provision of

article I, section 3 as imposing no further restrictions on the state's involvement with religious

institutions than the Establishment Clause, it would have to ignore both the clear meaning and

intent of the text and the unambiguous history of the no-aid provision."); *Council for Secular

Humanism v. McNeil*, 44 So.2d 112, 119 (Fla. Dist. Ct. App. 2010), *rev. denied*, 41 So.3d 215

(Fla. 2010) (explaining that the first sentence of the Florida Establishment Clause is consistent

with the federal Establishment Clause, but that the "no aid" provision imposes further restriction on state actors within Florida).

Plaintiffs contend that the time and expense of printing and mailing invitations constitutes an impermissible expenditure of revenue "in aid of" religion. (Dkt. 51, at 15). The fatal flaw in Plaintiffs' argument, however, is that while they do point to a government expenditure of funds, they fail to demonstrate how the mailing of invitations to various religious leaders in the Lakeland community *confers any benefit whatsoever* on any religion. *See McNeil*, 44 So. 3d at 120 (explaining that an inquiry under the no-aid provision "necessarily will be case-by-case and will consider such matters as whether the government-funded program is used to promote the religion of the provider, is significantly sectarian in nature, involves religious indoctrination, requires participation in religious ritual, or encourages the preference of one religion over another"). In *Pelphrey I*, the district court considered whether the printing, preparation, and mailing of similar invitations violated a provision of the Georgia Constitution prohibiting the expenditure of public money "directly or indirectly, in aid of any church, sect, cult, or religion denomination or of any sectarian institution." Ga. Const. art. I, § II, ¶XII. The court easily dismissed the plaintiffs' no-aid claim, noting:

> [T]he problem with Plaintiffs' claim is that they have not described how the sums at issue (e.g., 'cost' of time spent arranging for speaker, cost of stamps) are taken 'in aid of' any sect or sectarian institution. The record does not reflect any pecuniary benefit, either direct or indirect, conferred by Cobb County upon such groups, nor does it show that any religious organization received financial assistance from the County for the promotion and advancement of its theological views.

410 F. Supp. 2d at 1348. This Court concurs. What is more, the incidental expenditure of funds to invite invocation speakers to solemnize meetings of governmental bodies is, in the Court's view, simply not the type of practice contemplated by the Florida Constitution's Establishment

Clause. That is especially so in light of the longstanding tradition of solemnizing the meetings of both houses of the Florida legislature, a practice indicative of the innocuous, secular nature with which this State views legislative prayer. *See* Dkt. 53 (granting Defendants' Motion to Take Judicial Notice of the fact that "[t]he Florida House of Representatives and the Florida Senate have a long history of opening legislative sessions with prayer"). Thus, and because Plaintiffs' pleading of the no-aid clause of the Florida Constitution adds nothing to the Establishment Clause calculus above the requirements of the Federal Establishment Clause, the City's Motion for Summary Judgment (Dkt. 34) is granted as to Count II (Florida Establishment Clause) for the same reasons explained above with regard to Count I (Federal Establishment Clause). And, of course, because Plaintiffs' claims against the City of Lakeland have failed to survive the instant motion for summary judgment, Mayor Fields' Motion for Summary Judgment, which "adopts by reference the arguments asserted in the City's Motion for Summary Judgment," must also be granted. (Dkt. 30, at 6). Accordingly, it is

**ORDERED** that Defendant Gow Fields' Motion for Summary Judgment (Dkt. 30) and Defendant City of Lakeland's Motion for Summary Judgment (Dkt. 34) be **GRANTED** and Plaintiffs Atheists of Florida, Inc. and Ellenbeth Wachs' Motion for Summary Judgment (Dkt. 46) be **DENIED.** The Clerk of Court shall enter judgment for Defendants and close this case.

**DONE AND ORDERED** in Chambers, in Tampa, Florida on this 21st day of February, 2012.

ELIZABETH A. KOVACHEVICH
UNITED STATES DISTRICT JUDGE

Copies to: All parties and counsel of record.